EL PUEBLO DE PUERTO RICO, ETC., demandante y apelado, *v.* THE OCEAN PARK DEVELOPMENT CORPORATION; FELIPE SEGARRA SERRA y su esposa AMELIA BOERMAN; EDUARDO G. GONZÁLEZ y su esposa GLORIA PANIAGUA, demandados y apelantes.

Núm. 10452.—*Sometido:* Diciembre 4, 1951. · *Resuelto:* Abril 24, 1952

*Lino J. Saldaña, Luis F. Sánchez Vilella, José Trías Monge, Sarah Torres Peralta* y *C. Morales, Jr.*, abogados de la apelante Ocean Park Development Company; *Brown, Newsom & Córdova,* abogados de los apelantes esposos Segarra-Boerman y González-Paniagua; *Hon. Procurador General Víctor Gutiérrez Franqui, Clemente Pérez Martínez* y *Jaime J. Saldaña, Procuradores Generales Auxiliares,* abogados de El Pueblo, apelado.

EL JUEZ PRESIDENTE SEÑOR TODD, JR., emitió la opinión del tribunal.

El Pueblo de Puerto Rico, representado por el Presidente de la Comisión de Parques y Recreo Públicos de Puerto Rico, Sr. Julio Enrique Monagas, y bajo la autoridad que le confería la Ley núm. 4 de junio 30 de 1947 ((2) pág. 7) y la Ley núm. 141 de mayo 10 de 1948 ((1) pág. 327), radicó en noviembre 30 de 1948 demanda de expropiación forzosa para adquirir el dominio pleno de aproximadamente 21 cuerdas de terreno localizadas en terrenos donde están ubicadas las ur-

banizaciones de Santa Teresita y colindando con la terminación de la urbanización Ocean Park en Santurce. Dichos terrenos se expropiaban para la construcción y establecimiento de un parque público de recreo.

Las referidas 21 cuerdas de terreno se dividían en tres parcelas contiguas, una de 5.7034 cuerdas con frente al Océano Atlántico, colindando con la urbanización Ocean Park y propiedad de la demandada Ocean Park Development Corp. (a quien nos referiremos en adelante como Ocean Park), y las otras dos parcelas de 13.9638 y 1.50 cuerdas cada una, con frente a la prolongación de la calle Loíza, propiedad de los demandados Felipe Segarra y Eduardo G. González (a quienes nos referiremos en adelante como Segarra y González).

El demandante acompañó con su demanda una declaración de adquisición y entrega material inmediata depositando la suma de $206,138 que estimaba ser el valor justo y razonable en el mercado de los terrenos expropiados Una parte de esa cantidad, ascendente a $57,964, se consignó como el valor estimado de la parcela de 5.7034 cuerdas propiedad de Ocean Park, y $148,174 el de las parcelas de 15.4638 cuerdas pertenecientes a Segarra y González.

Ambos demandados solicitaron y obtuvieron del Tribunal de Expropiaciones la entrega de las referidas cantidades, pero reservándose el derecho a reclamar una suma mayor como justa compensación.

Los demandados Segarra y González en su contestación original y en una posterior enmendada alegaron que el valor justo y razonable en el mercado de sus 15.4 cuerdas era $303,894.27, equivalente a $5 el metro cuadrado. La codemandada Ocean Park en su contestación enmendada reclamó por sus 5.7 cuerdas un valor de $134,500.07, igual a $6 el metro cuadrado.

Habiéndose acordado por las partes se celebró el juicio conjuntamente y la prueba presentada se convino que se aplicaría a ambos demandados. El Tribunal de Expropiaciones

dictó sentencia fijando la compensación final a ser recibida por Ocean Park en $61,645.90, o sean $2.75 el metro cuadrado, y la compensación a ser recibida por Segarra y González en $151,947.15, equivalente a $2.50 el metro cuadrado, y ordenó al demandante a consignar a la disposición de los codemandados las sumas de $3,681.90 y $3,773.15, más interés al 6 por ciento anual desde el 30 de noviembre de 1948 hasta la fecha de la consignación. De esta sentencia apelaron tanto los codemandados Ocean Park y Segarra y González como El Pueblo de Puerto Rico. Posteriormente este último desistió de su apelación. Los recursos han sido consolidados y los resolveremos en una sola opinión.

Ocean Park ha señalado tres errores y dos Segarra y González, siendo los de éstos similares a los dos últimos de Ocean Park. Haremos referencia a ellos más adelante.

 El primer señalamiento de la corporación es al efecto de que el tribunal a quo erró al admitir en evidencia, a pesar de su objeción, y con el fin de determinar el valor en el mercado de la parcela expropiada, certificaciones del Registro de la Propiedad sobre varias ventas que el demandante presentó como prueba de los precios a que se vendieron terrenos similares a los expropiados.

En efecto, mientras declaraba el testigo del demandante Ferdinand Acevedo como perito tasador, y al estarse refiriendo a la forma en que había tasado los terrenos objeto de esta expropiación, afirmó que entre los factores que tomó en consideración, uno de los de mayor importancia era el del precio a que se habían vendido terrenos similares en fechas recientes a la expropiación. Esta prueba del demandante fué expresamente presentada en cuanto a ambas partes demandadas y en la misma forma fué considerada por el tribunal pues al iniciarse la presentación de esta prueba ocurrió lo siguiente:

"P. ¿Puede indicar qué ventas tomó en consideración? Sr. Juez, aquí realmente, a pesar de que estamos citando la prueba

respecto a Segarra y González, hay prueba de cierta naturaleza que la vamos a utilizar respecto a Ocean Park. Las cuestiones de ventas similares y algunos factores que ha tomado en consideración.

"Hon. Juez: La Corte hará lo mismo que va hacer con la prueba que presente en cuanto a los demandados. Tiene que tener el mismo peso, diferenciando la localización, el aspecto físico y su topografía. *Pero en cuanto a ventas similares, cercanía, todo eso tiene que aplicarlo a ambos casos."* (Bastardillas nuestras.)

Procedió entonces el testigo a referirse a la venta realizada en 8 de marzo de 1948 [1] de un predio de cinco cuerdas, situado a 800 metros de la parcela expropiada, cerca de la urbanización Punta Las Marías. El abogado de Segarra y González interrumpió al testigo para solicitar se especificara si el testigo estaba declarando de conocimiento propio o de conocimiento obtenido de una escritura, contestando el testigo que su conocimiento lo derivaba de una investigación realizada en el Registro de la Propiedad de Río Piedras. Se ofreció entonces una certificación expedida por el Registrador. Ocurrió luego lo siguiente:

"Lic. Córdova: Nos vamos a oponer si se presenta esa prueba independiente de venta similar. Si se presenta como la transacción que ha tomado en consideración para formar su juicio en este caso, no tenemos objeción. Nosotros admitimos que tomó en consideración esa transacción para formar su juicio. En el contrainterrogatorio lo probaremos. No aceptamos como venta similar en este caso.

"Lic. Pérez Martínez: Nos parece que el testigo ha determinado los factores de similaridad que a su juicio tiene esa finca.

"Hon. Juez: ¿Va a someterla?

"Lic. Gutiérrez: Tengo una objeción. Hacemos la objeción adicional de que la certificación no es admisible como prueba. No hay prueba en cuanto a precio.

"Hon. Juez: Me parece que está el precio de venta en la certificación.

---

[1] Luego se aclaró que fué en 31 de julio de 1947.

"Lic. Gutiérrez: Eso no es prueba de ese hecho *porque es prueba de referencia.*

"Lic. Córdova: No hemos hecho esa objeción porque es Segarra y González el vendedor en ese caso." (Bastardillas nuestras.)

Después de argumentadas las cuestiones planteadas el tribunal resolvió:

"La Corte va a admitir por ahora la certificación para demostrar que el testigo tuvo esa venta en consideración al fijar el precio que él le ha dado a esos terrenos. Los otros dos puntos, la Corte los resolverá luego de oír la prueba de la parte demandante y ante prueba de 'rebuttal'."

En igual forma que esta primera, la corte admitió trece certificaciones más referentes a otras tantas ventas, siempre con la oposición de los demandados. Después de un receso, sin embargo, en cuanto al punto específico de que las certificaciones registrales no eran admisibles para probar el precio pagado en ventas similares, dictó la siguiente resolución:

"La Corte va a resolver la cuestión planteada por la demandada Ocean Park con relación a que el precio que contiene y el que aparece en certificaciones del Registro o en copias certificadas de escrituras de terrenos que se pretenden introducir en evidencia como ventas similares, no es admisible a menos que no se le dé la oportunidad de repreguntar a las partes o alguna de las partes, en la siguiente forma: La Corte entiende que ese documento (sic) no es universal. Se ha resuelto en Illinois que es admisible esa prueba como evidencia, prima facie, del valor a que se han vendido los terrenos similares. En segundo lugar, donde se ha establecido esa jurisprudencia, generalmente no existe el Registro de la Propiedad que existe en Puerto Rico, a excepción de Louisiana y California. Se presume que el precio que aparece en el Registro y en las copias certificadas de las escrituras es el correcto y el acordado entre las partes. Es natural que la parte afectada por esa evidencia deba obtener, de acuerdo con lo resuelto en Puerto Rico, posible evidencia en cuanto a si ha habido cualquier otra consideración, además del valor que aparece en las escrituras, pero eso le correspondería demostrarlo a la parte afectada, ya sea atacando la declaración del testigo por medio del contrainterrogatorio o por otra prueba. Declaro sin

lugar esa cuestión. Admito la evidencia en relación con el precio pagado por esas otras parcelas que se describen en esas certificaciones como terrenos similares."

Hizo constar la corte que en Puerto Rico esta cuestión no había sido resuelta.

El abogado de Ocean Park solicitó la reconsideración citando el artículo 1172 del Código Civil, ed. de 1930,(²) y la corte ratificó su resolución.

Dos cuestiones levanta el apelado para sostener que no se cometió este error. Primero, que los demandados también presentaron ciertas escrituras sobre ventas de solares y por lo tanto están impedidos de levantar esta cuestión y segundo, que dichas certificaciones registrales constituyen evidencia prima facie del contenido de los asientos en los libros del Registro de la Propiedad, y cita los artículos 48, 49, 70 y 71 de la Ley de Evidencia (núms. 410, 411, 432 y 433 del Código de Enjuiciamiento Civil).(³)

Teniendo, a nuestro juicio, razón el apelado en cuanto al segundo fundamento, no tenemos que considerar el primero.

(²) El artículo 1172 dispone lo siguiente:

"Artículo 1172.—Los documentos públicos hacen prueba, aun contra tercero, del hecho que motiva su otorgamiento y de la fecha de éste.

"También harán prueba contra los contratantes y sus causahabientes, en cuanto a las declaraciones que en ellos hubiesen hecho los primeros."

(³) Estos artículos disponen:

"Artículo 410.—Todo funcionario público bajo cuya custodia obrare algún documento público, está en la obligación de facilitar, al requerírsele, copia certificada del mismo, mediante el pago de los derechos legales correspondientes, y dicha copia será admisible como evidencia en los mismos casos y con igual efecto, que el escrito original.

"Artículo 411.—Los documentos públicos se dividen en cuatro clases:

"1. Leyes. 2. Protocolos judiciales. 3. Otros documentos oficiales. 4. Archivos públicos de documentos públicos o privados, llevados en Puerto Rico.

"Artículo 432.—El registro público de un documento puede probarse mediante el registro original o copia del mismo, certificada por el guardador legal del registro.

"Artículo 433.—Los asientos en libros o registros públicos u oficiales, practicados en el desempeño de su cargo por un funcionario público de Puerto Rico, u otra persona en el cumplimiento de una obligación especialmente encomendádale por la ley, constituyen evidencia prima facie de los hechos consignados por estos asientos."

Los artículos de la Ley de Evidencia citados por el apelado, y especialmente el 71, tienen el alcance de hacer inaplicable en Puerto Rico la doctrina expuesta en los casos y autoridades citados por nosotros en el de *Pueblo* v. *Lamboglia*, 70 D.P.R. 810, escolio (1), a la pág. 812, y en el cual, a manera de *dictum*, supusimos que prueba de esta naturaleza—certificaciones registrales y escrituras públicas—era inadmisible. El *ratio decidendi* en dicho caso fué al efecto de que dicha prueba era admisible para impugnar la declaración de un perito. La suposición expuesta en la opinión en cuanto a su inadmisibilidad para otros fines estaba basada en la doctrina imperante en las jurisdicciones americanas sin haberse tomado en consideración las disposiciones de nuestra Ley de Evidencia.

De acuerdo con los artículos de la Ley de Evidencia antes citados y con el artículo 45 de dicha ley (artículo 407 del Código de Enjuiciamiento Civil), en relación con el artículo 1170 del Código Civil, ed. de 1930, (⁴) una certificación registral es un documento público—Manresa, Código Civil, tomo 8, vol. 2, 5ta. ed., pág. 31—y es admisible como evidencia en los mismos casos y con igual efecto que el escrito original y constituye evidencia prima facie de los hechos consignados en la misma. Esos hechos, sin embargo, pueden ser impugnados por otra prueba que los contradiga o desvirtúe. Artículo 11, Ley de Evidencia (art. 373, Código de Enjuiciamiento Civil) ; *Camacho* v. *Balasquide*, 19 D.P.R. 590, 603–604; *Moll* v. *Llompart*, 17 D.P.R. 694, 699; *cf. Negrón* v. *Corujo*, 67 D.P.R. 398, 401. De más está decir que las certificaciones registrales podrán ser tomadas en consideración por el perito, con la demás prueba a su alcance, con el fin de expresar su opinión en cuanto

---

(⁴) Estos artículos disponen:

"Artículo 407.—Son documentos públicos:

"Los que se determinan en el artículo 1184 del Código Civil." (Art. 1170 del Código Civil, ed. de 1930.)

"Artículo 1170.—Son documentos públicos los autorizados por un notario o empleado público competente, con las solemnidades requeridas por la ley."

al valor en el mercado de los terrenos expropiados. Consideramos, además, que el artículo 1172 del Código Civil, supra, citado por la apelante, no desvirtúa el alcance que, como evidencia prima facie, tienen las certificaciones registrales admitidas. Manresa, ob. cit., págs. 40–43. No se cometió este primer error.

■■ El segundo error señalado por la apelante Ocean Park, que es igual al primero señalado por Segarra y González, es al efecto de que el tribunal inferior descartó y dejó de considerar para determinar el precio en el mercado de los terrenos expropiados la prueba admitida sobre la venta de 45,000 metros cuadrados de terrenos adyacentes a los expropiados hecha por Segarra y González a Frank Ramírez de Arellano a un precio de $4.50 por metro cuadrado. En estos terrenos es que está situada actualmente la urbanización Santa Teresita.

Varios son los argumentos que presentan los apelantes para sostener que este error fué cometido. Hacen hincapié en el hecho de que habiendo admitido el tribunal inferior la extensa prueba testifical y documental en relación con la venta que hicieran Segarra y González a Ramírez de Arellano, al resolver el caso se expresó en esta forma:

"Aunque admitimos esta evidencia para estudiar su alcance y considerar su peso, nos hemos convencido que la misma *carece de valor probatorio alguno* para la determinación final del valor en el mercado de las propiedades expropiadas a los demandados.

"La Legislatura de Puerto Rico aprobó en 10 de mayo de 1945 la Ley núm. 159, a virtud de la cual confería poderes y facultades al Comisionado de lo Interior para llevar a cabo las obras de planear, construir, desarrollar, cuidar, explotar, administrar y conservar los sitios de recreos para el pueblo, y declaraba de utilidad pública todos los bienes inmuebles y sus accesorios, intereses y derechos que dicho Comisionado estimara fueran necesarios para tales fines, y le confirió poderes además para recurrir al procedimiento de expropiación forzosa sin la previa declaración de utilidad pública provista en la Ley General de Expropiación Forzosa.

"El artículo 9 de la ley mencionada fué enmendado por el artículo 4 de la Ley núm. 4 aprobada en 30 de junio de 1947. Consistió la enmienda en conferir los poderes enumerados anteriormente directamente a la Comisión de Parques y Recreo Públicos.

"Haciendo uso de estas facultades, primero el Comisionado de lo Interior y luego la Comisión, creyeron necesario adquirir con el fin de crear un parque de recreo público en la calle Loíza de Santurce, los terrenos comprendidos en las parcelas expropiadas, y sometieron el proyecto de adquisición a la Junta de Planificación. Este organismo aprobó el mismo mediante resoluciones de 12 de junio de 1946 y 3 de septiembre de 1947.

"Surge de la prueba a través de los testimonios de Eduardo G. González, Gabriel Ferrer y Telesforo Carrero que en dos o tres ocasiones los demandados concurrieron a audiencias celebradas en la Junta de Planificación en relación con los proyectos de urbanización de Santa Teresita y de Ocean Park, en las cuales fué objeto de estudio y discusión el establecimiento del parque de recreo. Tanto es así, que en todos los planos preparados por Del Valle en 1947, aparecen, como ya hemos dicho, separados los terrenos para este propósito.

"Seleccionados los terrenos por la Comisión de Parques y Recreo Públicos y aprobada la segregación y adquisición de los mismos por el organismo planificador, es que la Legislatura aprueba la Ley núm. 141 de 10 de mayo de 1948, asignando los fondos necesarios para su adquisición.

"Los demandados mantienen que el incremento habido antes del 10 de mayo de 1948 debe ser considerado por el Tribunal para determinar el valor en el mercado de los bienes expropiados, y alegan que de sostener que hubo incremento con motivo del proyectado parque, éste debe ser el habido después de esa fecha. Invocan la jurisprudencia sentada en los casos de *Kerr* v. *South Park Commissioners*, 117 U. S. 379 (29 L. ed. 924) ; *Shoemaker* v. *United States*, 147 U. S. 282 (37 L. ed. 170) y *United States* v. *Miller*, 317 U. S. 369 (87 L. ed. 336).

"La Corte no tiene la menor duda de que los casos citados sostienen una doctrina enteramente contraria a la alegada por los demandados. Si la aplicamos al estado de hechos que se nos ha presentado, tenemos que llegar a la ineludible conclusión de que una de las consideraciones importantes que indujo a Ramírez a pagar $4.50 por metro cuadrado fué el hecho de que el establecimiento del parque entre los terrenos adyacentes hacía éstos más

atractivos para la construcción de casas dedicadas a fines residenciales. No sólo él admitió esta circunstancia, sino que la utilizó como reclamo en un anuncio publicado en 22 de mayo de 1948 en la prensa diaria del país, en el cual aparece la fotografía de una hoja de los planos preparados por Del Valle y Cía.

"Entendemos que el Gobierno de Puerto Rico se decidió a construir el·proyectado parque desde el momento en que *el Comisionado de lo Interior seleccionó los aludidos terrenos en 1946 cumpliendo con las disposiciones de la ley aprobada en 10 de mayo de 1945*. La fecha en que compensaron (sic) las actuaciones y medidas adoptadas por dicho Comisionado, por la Comisión de Parques y Recreo Públicos y por la Junta de Planes es la que controla desde cuándo debe ser considerado el incremento en valor de los terrenos adyacentes por razón de la construcción de una obra para fines públicos, en un caso como el presente.

"Se ha resuelto que el dueño a quien se le expropian bienes no debe obtener ganancias a través de especulaciones sobre el probable aumento en valor que pudiera derivarse por razón de las actividades del Estado. (*U. S.* v. *Miller*, supra)." (Bastardillas nuestras.)

Arguyen entonces los apelantes que lo que en realidad hizo el tribunal fué determinar, después de cerrado el caso, que la evidencia sobre esa venta era inadmisible para probar el valor de los terrenos expropiados porque no era una venta de terrenos similares y aplicó, por tanto, erróneamente, la regla de exclusión de evidencia establecida en los casos de *Kerr* (117 U. S. 379), *Shoemaker* (147 U. S. 282) y *Miller* (317 U. S. 369) citados en su opninón. Sostienen además los apelantes que la actuación del tribunal fué errónea de acuerdo con nuestra decisión en el caso de *Viera* v. *Sucn. Goitía*, 60 D.P.R. 653, en el cual resolvimos, citando del sumario, que "Después que la evidencia ha sido definitivamente admitida y se ha terminado el juicio, ni el juez que lo presidió ni su sucesor pueden eliminarla del récord o negarse a considerarla, por lo menos sin reabrir el caso y darle a la parte afectada una oportunidad de suplir la deficiencia que ·resultare de la prueba."

Para una mejor comprensión de lo que verdaderamente ocurrió en relación con la prueba mencionada se hace nece-

sario volver a citar del récord. A la página 744 de la segunda pieza, en la transcripción de evidencia, el abogado del demandante se dirigió al tribunal y solicitó la eliminación de toda la prueba relacionada con la venta de los terrenos de Santa Teresita porque se había probado que para la fecha en que Ramírez de Arellano los adquirió ya se había determinado con seguridad la localización de los terrenos adyacentes, objetos de la presente acción, para ser usados como un parque público. Ocurrió entonces lo siguiente:

"Lic. Córdova Díaz: Vamos a perder tiempo. *Esto todo se puede discutir en alegato.*

"Demandante: *De manera que nosotros solicitamos ahora del tribunal la eliminación de toda esa evidencia por esos fundamentos.*

"Lic. Córdova Díaz: *Yo creo que la cuestión ésa se puede discutir en alegato, en cuanto al valor probatorio que pueda tener esa venta.* Es más, creo que ese caso fué revocado por el Supremo.

"La Corte: No. Uno de los 'issues' que tiene que determinar el tribunal en este caso es si para la fecha en que se hicieron las ventas de los terrenos por Segarra y González a Frank Ramírez *ya existía por mandato legislativo el propósito de construir el parque de pelota.* Eso lo tiene que determinar la corte de acuerdo con la prueba presentada y con el estudio de la ley.

"Lic. Córdova Díaz: No hay ninguna ley.

"Lic. Gutiérrez Franqui: Perdone, señor Juez, en ese caso se resuelve que un mandato legislativo no constituye ninguna clase de 'taking'. No tiene ninguna importancia por razón de que la ley se puede derogar, o puede no asignarse los fondos, y que pueden pasar muchísimas cosas. Lo encontramos en un párrafo de este caso (*Miller* v. *United States,* 125 F. 2d 75) : que el mandato legislativo no se considera como 'taking', ni como nada en relación con la fecha para determinar el valor en el mercado.

"La Corte: En segundo lugar, una cosa que el mismo Frank Ramírez de Arellano declaró, a preguntas del letrado de la parte demandante, fué que él consideraba que el establecimiento de un parque público en todo este trazado le daba cierto 'enhancement', cierto aumento a los valores de los terrenos adyacentes, que la corte también tiene que considerar. *De modo que la corte*

*va a denegar la solicitud de eliminación, para darle el peso que la misma tenga. En sus alegatos las partes deben darle énfasis a aquel peso que consideren las partes que tiene esa evidencia, y la corte resolverá."* (Bastardillas nuestras.)

De manera que, si bien el tribunal inferior se negó a eliminar la prueba, es bien claro que a petición del abogado de Segarra y González, dejó para ser discutido en los alegatos el peso que la misma pudiera tener y que entonces el tribunal resolvería. Y eso fué lo que hizo en la parte de su opinión antes citada, no excluir la prueba como sostienen los apelantes sino no darle valor probatorio. Es obvio que estos hechos son muy distintos a aquéllos que dieron lugar a nuestra decisión en el caso de *Viera* v. *Sucn. Goitía,* supra.

Ahora bien, ¿erró el tribunal a quo al resolver que la venta de los terrenos de Segarra y González a Ramírez de Arellano no tiene valor probatorio alguno? Creemos que no. Independientemente del factor aislado del incremento en valor que dichos terrenos pudieron haber tenido con motivo de haberse separado por el Comisionado de lo Interior, la Comisión de Parques y Recreo Públicos con la intervención de la Junta de Planificación y la asignación de fondos por la Legislatura de Puerto Rico, las parcelas objeto del presente caso de expropiación con fines de establecer un parque, (5) en la transacción entre Ramírez de Arellano y Segarra y González hubo otros factores que tuvo en consideración el primero para pagar al precio de $4.50 el metro cuadrado. Que el tribunal inferior

---

(5) En relación con este factor, el artículo 2 de la Ley núm. 479 aprobada el 26 de abril de 1946 ((1) pág. 1403) dispone en su primer párrafo lo siguiente:

"En el caso de compra o expropiación forzosa de la propiedad particular para fines de utilidad pública o beneficio social, *la indemnización deberá basarse en el valor razonable en el mercado de tal propiedad sin incluir incremento alguno por razón de espectativa fundada y razonable de que la propiedad adquirida, u otra propiedad similar a la misma, o que se encontrara dentro de la localidad en que estuviera aquélla situada,* se requiera o se haya de requerir para uso público o beneficio social, o fuere necesaria para algún uso que tan sólo pudiere darle El Pueblo de Puerto Rico o cualquier agencia o instrumentalidad del mismo con poderes para la expropiación forzosa de la propiedad particular." (Bastardillas nuestras.)

tomó en consideración todos esos factores apareció claramente expresado en su opinión al explicar cómo se realizó dicha transacción en esta forma:

"Frank Ramírez de Arellano entró en negociaciones con Segarra y González para comprarle 45,000 metros cuadrados a razón de $4.50 cada uno, ubicados al Oeste de la parcela expropiada, y a tal efecto, en enero 19 de 1948, se formalizó un contrato privado a virtud del cual el comprador entregaba $20,000 en el acto y se comprometía a pagar el balance dentro de un año a partir de la fecha en que los planos de urbanización fueran aprobados por la Junta de Planes, pero obligándose también a abonar a los vendedores $6 por metro cuadrado de los solares que vendiera Ramírez hasta el completo pago del precio aplazado, aunque éste siempre tenía que ser satisfecho dentro del año.

"Hubo otras consideraciones además de la indicada. Los vendedores otorgaron una opción de compra a Ramírez sobre el resto de la finca, que tenía una cabida de 113,547.25 metros cuadrados, radicada al Este de la parcela expropiada, la que habría que regirse por los mismos términos y condiciones de la anterior y la que Ramírez venía obligado a ejercitar ocho meses después de la fecha de la aprobación de los planos por la Junta de Planes.

"También se obligaron los vendedores a obtener de la Junta de Planificación la aprobación de los planos de urbanización, los cuales habían sido preparados por Del Valle y Cía., y por los que los vendedores habían pagado $8,000 en marzo 31 de 1947, suma que no fué cargada a Ramírez en el precio de venta.

"Es conveniente apuntar que en los referidos planos aparecen deslindadas las tres parcelas expropiadas, con una nota que textualmente lee: 'Area exigida para parque por la Junta de Planificación'.

"Los vendedores venían también obligados por el contrato a sanear en caso de evicción los terrenos vendidos y a entregarles libres de detentadores, usufructuarios o poseedores.

"Posteriormente y luego de las partes haber cumplido con las cláusulas y condiciones del contrato, según fué modificado por acuerdo mutuo en noviembre 10 de 1948, en cuanto a la forma de pagar el comprador a los vendedores el precio aplazado, se otorgaron sendas escrituras públicas, copias de las cuales se han presentado como evidencia en este caso.

"En relación con esta transacción Ramírez declaró durante el juicio que de no habérsele otorgado las facilidades de pago y

las otras concesiones que aparecen del contrato, no hubiera pagado los ameritados predios a $4.50 el metro cuadrado. Admitió que el hecho de que se proyectara·construir un parque para recreo público entre las secciones Este y Oeste de la urbanización Santa Teresita, indudablemente acrecentaba el valor de los terrenos adyacentes. No estableció a cuánto equivaldría la diferencia del valor de estos terrenos adyacentes antes de tener conocimiento del proyecto y después. Tampoco nos dijo en cuánto estimaba el valor de las consideraciones especiales que le fueron concedidas por los vendedores en toda la transacción."

Hemos examinado detenidamente la prueba relacionada con dicha transacción y consideramos que no erró el tribunal sentenciador al concluir que eran tantos y diversos los factores que intervinieron en la misma que en realidad no constituyó una venta de terrenos similares. No fué basándose únicamente en el incremento en precio que pudieron haber tenido los terrenos vendidos a Ramírez de Arellano con motivo de colindar con el parque de recreo que el Gobierno había determinado establecer en las parcelas aquí expropiadas que el tribunal a quo no .le dió valor probatorio a dicha venta, no obstante haber citado los casos de *Kerr*, *Shoemaker* y *Miller*, supra, sino que concurrieron otros factores.adicionales y, tomándolos en consideración todos en conjunto llegó a dicha conclusión. No puede, por tanto, sostenerse que el tribunal erró al aplicar los casos de *Kerr*, *Shoemaker* y *Miller*, supra, ya que, primero, no excluyó la evidencia ofrecida; segundo, interpretó bien su alcance y el del artículo 2 de la Ley núm. 479 de 1946, supra; y tercero, no fué el factor del incremento en precio, por el motivo antes ·mencionado, el único envuelto en el presente caso como lo fué en aquéllos.

■ ·El último error señalado por ambos apelantes es que el tribunal sentenciador erró en los cálculos matemáticos que hizo para determinar el valor en el mercado de las parcelas expropiadas.

En efecto el tribunal, siguiendo la pauta señalada en el caso de *United States* v. *Iriarte,* 166 F. 2d 800 (C. A. 1, 1948) ([6]) y por estar todas las partes conformes, ([7]) admitió en evidencia cinco escrituras de ventas de solares urbanizados ofrecidas por los apelantes y cinco escrituras de ventas similares ofrecidas por el apelado. Sumó entonces los precios a que fueron vendidos estos diez solares ([8]) y dividiendo por diez obtuvo como promedio de dichas ventas $8.15 por metro cuadrado. Todas las partes están contestes en que el tribunal a quo erró al sacar dicho promedio pues el resultado correcto es el de $8.84 por metro cuadrado. Procedió entonces el tribunal, a base de los $8.15, a hacer los siguientes cálculos, en cuanto a las distintas parcelas:

---

([6]) En dicho caso la corte dijo a la pág. 804:

"Tampoco tiene méritos la contención del Gobierno de que las ventas de solares no pueden tenerse en consideración para determinar el valor del área total no desarrollada. Véase *United States* v. *3.544 Acres of Land,* 3 Cir., 147 F.2d 596.

"Ciertamente, evidencia del precio de venta de los solares puede ser mal usada al valorar el área total. Es obvio que hubiera sido error patente de la corte inferior el seguir la sugerencia de los dueños y haber valorado sus terrenos sencillamente multiplicando el número de metros cuadrados existentes en la propiedad por el precio promedio por metro cuadrado a que Canejas vendió sus solares. Dicho método de valoración no toma en consideración el costo de lotificación y venta de los solares, así como tampoco lo que debe rebajarse del área total por concepto de calles, etc. al venderse el terreno en solares. La cuestión en casos de esta naturaleza es el valor del terreno antes de éste lotificarse, y no después, y ciertamente el precio que un inversionista pagaría por terrenos no desarrollados, propios para lotificar, estaría sujeto al precio que él esperaría obtener por cada solar después de hecha la lotificación. Pero, desde luego, también tomaría en consideración los gastos de urbanización. . ."

([7]) Esto no obstante, véase nuestra decisión en *Pueblo* v. *Cementerio Buxeda, Inc.,* 72 D.P.R. 326, ahora pendiente en apelación ante la Corte de Apelaciones para el Primer Circuito.

([8]) Arguyen los apelantes Segarra y González que en una de las escrituras presentadas por ellos se vendieron dos solares y que, por tanto, en total fueron once los solares vendidos y que el tribunal debió haber sumado el precio de once solares y no de diez, y haber dividido por once y no por diez. No creemos que debemos intervenir con la discreción judicial ejercida por el tribunal a quo al hacer sus cálculos a base de diez y no de once ventas.

"A. Parcela de Ocean Park:

Producido bruto = 14430 M² × $8.15 = $117, 604. 50
asumiendo que esta cantidad incluye un 25 por ciento de beneficio, esto constituye 125 por ciento de la inversión, igual a: $117,604.50 ÷ 1.25 = 94, 083. 60

Beneficio para el urbanizador:
$117,604.50 menos $94,083.60 = 23, 520. 90

Costo del desarrollo de la urbanización = 40, 836. 63

Valor del terreno = 53, 246. 97

Costo por metro cuadrado:
$53,246.97 ÷ 22416.69 M² = 2. 38"

"B. Parcela de Segarra y González:

Producido bruto: 40088 M² × $8.15 = $326, 717. 20

Asumiendo que esta cantidad incluye un 25 por ciento de beneficio, esto constituye 125 por ciento de la inversión, igual a: $326,717.20 ÷ 1.25 = 261, 373. 76

Beneficio para el urbanizador:
$326,717.20 menos $261,373.76 = 65, 343. 44

Costo desarrollo de la urbanización = 138, 299. 44

Valor del terreno:
$261, 373.76 menos $138,299.44 = 123, 074. 32

Valor del terreno por metro cuadrado:
$123,074.32 ÷ 60778.86 M² = 2. 025"

A este valor de $2.38 y $2.025 por metro cuadrado de los terrenos de Ocean Park y Segarra y González, respectivamente, el tribunal, tomando en cuenta otras ventas, concedió un aumento adicional y fijó el valor del metro cuadrado de Ocean Park en $2.75 y el de Segarra y González en $2.50.

Arguye el apelado que aún admitiendo el error matemático cometido por el tribunal al hacer el promedio, si se hicieran los cálculos a base de $8.843 por metro cuadrado, que es el promedio correcto, los resultados serían $2.73 el metro cuadrado para Ocean Park y $2.39 el metro cuadrado para Segarra y y González, que serían inferiores a los $2.75 y $2.50 concedidos. No tiene razón el apelado. Al así argüir deja de tomar en consideración el hecho de que el tribunal inferior

concedió un aumento de cerca de un 25 por ciento por metro cuadrado al valor originalmente obtenido a virtud de dichos cálculos. (Véase escolio 5, pág. 76 de la transcripción de autos.

Arguyen los apelantes, por su parte, que este Tribunal debe aumentar dicho 25 por ciento del valor por metro cuadrado obtenido después de hacerse la corrección en los cálculos a base de los $8.843 por metro cuadrado. No creemos que debamos hacerlo pues no estamos en condiciones de determinar si, como cuestión de hecho, el tribunal inferior hubiera concedido dicho aumento no obstante el valor por metro cuadrado obtenido como consecuencia de los nuevos cálculos, una vez corregido el error matemático cometido. Consideramos que ésta es una cuestión que debe ser resuelta en primera instancia por dicho tribunal.

*Por lo expuesto, procede dejar sin efecto la sentencia dictada y devolver el caso para ulteriores procedimientos consistentes con esta opinión en relación con el tercer error señalado.*

El Juez Asociado Sr. Negrón Fernández se inhibió.