El Juez Presidente Sr. Negrón Fernández no intervino.

ESTADO LIBRE ASOCIADO DE PUERTO RICO, representado por su Gobernador, demandante y recurrido, *v.* SUCESIÓN DE FELIPE GAUTIER, ETC., demandada y recurrente.

Número 12583.

*Sometido:* 10 de agosto de 1959. *Resuelto:* 10 de septiembre de 1959.

*Luisa María Capó y Yamil Galib Frangie,* abogados de la recurrente; *Hon. Secretario de Justicia Hiram R. Cancio, Arturo Estrella, Secretario Auxiliar de Justicia y V. M. Sánchez Fernández, Procurador Auxiliar,* abogados del recurrido.

EL JUEZ ASOCIADO SEÑOR SERRANO GEYLS emitió la opinión del Tribunal.

El recurrente nos somete dos planteamientos en este recurso sobre expropiación forzosa. En el primero impugna la constitucionalidad de la legislación sobre expropiación forzosa aplicable a los proyectos de reurbanización y renovación urbana y en el segundo la valoración de los bienes expropiados.

El Estado Libre Asociado, representado por su Gobernador, interpuso demanda de expropiación forzosa contra los dueños de una parcela de terreno ubicada en la ciudad de Ponce, sitio conocido como Palo de Pan. Entre ellos se encuentra la aquí recurrente. La demanda especificaba que el procedimiento se instituía "a requerimiento y para uso y beneficio de la Autoridad Municipal sobre Hogares de Ponce" y enumeraba las leyes que lo autorizaban.[1] Añadía que se instituía "interesando que la mencionada Autoridad Municipal sobre Hogares de Ponce quede investida con un título de dominio absoluto sobre las propiedades . . . para que dicha Autoridad proceda a eliminar el arrabal Palo de Pan que radica en Ponce, Puerto Rico y en el cual están comprendidas las propiedades objeto de expropiación que serán dedicadas por la Autoridad a la realización de un proyecto de reurbani-

---

[1] Ley de Expropiación Forzosa de 12 de marzo de 1903, Ley núm. 126 de 6 de mayo de 1938, Ley núm. 97 de 9 de mayo de 1947, Ley núm. 364 de 10 de mayo de 1952, Resolución Conjunta núm. 46 de 8 de junio de 1954 y la Ley Nacional sobre Hogares (*Housing Act of 1949, Public Law 171, 81st Congress*).

zación de conformidad con la Ley núm. 97 aprobada el 9 de mayo de 1947" y las demás leyes. Afirmaba, también, que "la adquisición de las propiedades objeto de esta acción constituye una necesidad pública y el fin para el cual se adquieren es de utilidad pública." En el párrafo (8) se hacía constar que "la Autoridad . . . ha determinado que es deseable, conveniente, ventajoso y necesario adquirir las propiedades objeto de esta acción, para llevar a cabo la obra pública indicada, la cual determinación la hizo aprobando la Resolución núm. 676 el 3 de febrero de 1955". Se incluían, además, otras alegaciones pertinentes en estos procedimientos, entre ellas la de que la Junta de Planificación había aprobado la adquisición de las propiedades necesarias para llevar a cabo la mencionada obra pública. Se hizo, además, el depósito de fondos que la ley requiere. Luego de los trámites usuales los demandados contestaron planteando en síntesis las mismas cuestiones que tenemos ante nos. Después de una vista, el Tribunal Superior dictó sus conclusiones y sentencia. Sostuvo la constitucionalidad de la legislación impugnada y aumentó la compensación a pagarse por la propiedad de $4,640 a $7,333.33.

La recurrente presenta la cuestión constitucional por medio de un doble enfoque: "1. Erró el tribunal a quo al concluir que la legislación en la cual descansa el demandante en su aplicación al caso de autos, no priva a los demandados de su propiedad sin el debido proceso de ley ni equivale al ejercicio del poder de expropiación forzosa para beneficio de intereses privados negando a los demandados su derecho a una igual protección de las leyes." "2. Erró el tribunal a quo al concluir que los demandados no tienen en el presente caso derecho a que les sean restituídos los bienes objeto de la expropiación previo el pago por ellos al demandante de las sumas empleadas por éste en mejorar dichos bienes."

No obstante, en su alegato la recurrente reduce su argumentación a impugnar el "uso público" de la expropiación y a sostener que se ha violado el Artículo II Sección 9 de la

Constitución estatal.(²)   No cuestiona que existe en este
caso el fin público de eliminar el arrabal "Palo de Pan", pero
señala que ese fin puede obtenerse removiendo las estructuras
expropiadas y dejando el terreno en manos de sus dueños para
que éstos lo urbanicen de acuerdo con las leyes y los reglamen-
tos de planificación y construcción vigentes.   Añade que en
este caso, contrario al de *Berman* v. *Parker*, 348 U. S. 26
(1954) no existe prueba sobre cuál es el plan específico de re-
urbanización que va a llevarse a cabo y no se excluye "la
posibilidad de que dichos terrenos sean ofrecidos al mejor
postor para establecer allí una urbanización privada para
personas acomodadas y/o establecimientos comerciales priva-
dos y con fines puramente lucrativos".

■■■■   Comenzamos, como es de rigor, con una descrip-
ción del plan legislativo y de sus propósitos.   El art. 1 de la
Ley de Reurbanización y Construcción de Viviendas (17
L.P.R.A. secs. 101–119) declara que existen en muchas
comunidades de Puerto Rico zonas decadentes(³) (*blighted
areas*) o en proceso de decadencia y que tales zonas reducen
los valores económicos y las rentas públicas, producen au-
mento y propagación de enfermedades y crímenes y constitu-
yen una amenaza para la salud, seguridad, moral y el bienes-
tar de los habitantes de Puerto Rico y además "que estas
condiciones hacen necesario desembolsos excesivos y despro-
porcionados del erario público, para la prevención y castigo
del crimen, la salud y seguridad públicas, la protección contra
incendios y accidentes, y otros servicios y facilidades públi-
cas."   Se concluye que "la eliminación, replanificación y

---

(²) "No se tomará o perjudicará la propiedad privada para uso público
a no ser mediante el pago de una justa compensación y de acuerdo con la
forma provista por ley."

(³) En su art. 2 la Ley define las zonas decadentes (incluyendo los arra-
bales) como "zonas con edificios o mejoras que, por su estado ruinoso, cadu-
cidad, hacinamiento, distribución o trazado deficiente, pobreza de ventila-
ción, de iluminación y de facilidades sanitarias, utilización excesiva de la
superficie del terreno, uso pernicioso de los solares, o trazado anticuado, o
por cualquier combinación de éstos u otros factores, sean perjudiciales a la
seguridad, salubridad, moral o bienestar de la comunidad."

preparación para la reconstrucción de estas zonas y la prevención o reducción de la decadencia y sus causas, constituyen usos y propósitos públicos" y que es de interés público que estas zonas y otras similares "sean adquiridas por expropiación forzosa y habilitadas para una urbanización indemne y sana; y que el ejercicio del derecho de dominio eminente y el financiamiento de la adquisición y preparación de terrenos por una agencia pública, para tal reurbanización constituye asimismo uso y propósito público." Se declara, además, que las actividades de reurbanización "fomentarán la construcción de residencias"; "constituirán una ayuda para mejores construcciones de viviendas y para el desarrollo de comunidades y vecindarios más deseables"; y "ayudarán materialmente en la obtención y mantenimiento de jornadas completas de trabajo." El art. 2 faculta a las autoridades sobre hogares para adquirir zonas decadentes y propiedad inmueble para hacer desaparecer o reducir la decadencia, o donde las condiciones existentes impidan el adecuado desarrollo de la propiedad y sean necesarias para la ejecución del plan de reurbanización; para hacer desocupar las zonas adquiridas; y para la venta o arrendamiento de los terrenos adquiridos. Le concede todos los poderes necesarios para la ejecución de los proyectos. (Art. 3.)

Todo plan de reurbanización debe ser aprobado por la Junta de Planificación y debe indicar "su relación con objetivos locales definidos en cuanto a utilización adecuada de los terrenos, mejoras de tránsito, transportación pública, servicios públicos, facilidades recreativas y comunales, y otras mejoras públicas"; la utilización de terrenos propuesta y los requisitos de construcción; el método de reubicación provisional de los residentes; y el método para proveerles "viviendas decentes, seguras y sanitarias". (Art. 4) "Con la aprobación de la Junta de Planificación de Puerto Rico, la autoridad podrá hacer disponibles, en un proyecto de reurbanización, los terrenos para uso de empresas privadas o agencias públicas de acuerdo con el plan de reurbanización." (Art. 5)

Los compradores o arrendatarios deben utilizar los terrenos para los fines designados en el plan de reurbanización, comenzar la construcción dentro de un tiempo razonable y cumplir cualquier otra condición necesaria para llevar a cabo los fines de la Ley. Las "obligaciones de esta índole impuestas al comprador serán convenios y condiciones que pasarán con los terrenos cuando la autoridad así lo estipule." (Art. 5) [4]

Las disposiciones reseñadas en el párrafo anterior constituyen prueba inequívoca del cuidado que ejerció el legislador al concebir y estructurar este programa. Tales mandatos van dirigidos, sin duda, a garantizar el estricto cumplimiento de los fines públicos que la ley expresa. Impiden que la zona expropiada se convierta de nuevo en un lugar indeseable y que las personas que en ella habitan puedan, mediante un simple traslado en masa, repetir en otro sitio las deplorables condiciones de vivienda y diseño urbano que se interesa erradicar. Sin éstas o similares precauciones se tornaría en amarga caricatura el esfuerzo oficial y en vacío e inexcusable gesto de poder la expropiación realizada.

Para los propósitos señalados en la ley cualquier autoridad puede tomar dinero a préstamo (incluyendo la emisión de bonos) o aceptar contribuciones del gobierno federal. [5]

Esta ley es suplementaria de otras leyes sobre hogares en las cuales la Asamblea Legislativa ha expresado propósitos similares a los ya descritos y ha diseñado otros instrumentos para ayudar a resolver el problema. [6] Debe destacarse en-

---

[4] En 1957 se estableció una "preferencia a familias desplazadas por los proyectos" para la adquisición de solares residenciales en los terrenos reurbanizados "siempre que (la autoridad lo considere factible y sea compatible con el método adoptado para disponer de dichos terrenos." (17 L.P.R.A. sec. 119).

[5] La Ley núm. 82 de 20 de junio de 1955 y la núm. 66 de 17 de junio de 1957 (17 L.P.R.A. secs. 112–119) añadieron varios artículos a la ley original, pero no alteraron en su esencia los propósitos y organización del sistema. Contienen en varios aspectos declaraciones legislativas más explícitas que las que se encuentran en la ley original.

[6] Examínese el Título 17 de L.P.R.A. donde se incluyen la Ley de Cooperación sobre Hogares, la de la Administración y la Corporación de Renovación Urbana y Vivienda, y la de Eliminación de Arrabales.

tre estas leyes la núm. 126 de 6 de mayo de 1938 (17 L.P.R.A. secs. 31–54). En ella se autoriza a las autoridades(⁷) a adquirir mediante expropiación forzosa cualesquiera bienes inmuebles que considere necesarios para lograr los fines de la ley, entre ellos la eliminación de arrabales. La ley (art. 3) define "arrabal" como "cualquier zona donde predominan las viviendas que por deterioro, aglomeración, disposición o diseño defectuosos, falta de ventilación, de luz o de facilidades higiénicas, o por cualquier combinación de estos factores, son perjudiciales a la seguridad, la salud o la moral". Las autoridades pueden, sujetas a ciertas limitaciones, vender o arrendar a personas privadas los terrenos adquiridos por expropiación. (17 L.P.R.A. secs. 38, 66–76.)

Es en verdad abundante la jurisprudencia federal y estatal relativa al problema de la constitucionalidad de las leyes de renovación y reurbanización urbanas. Igualmente prolífica es la literatura sobre el tema.(⁸) El problema es uno de múltiples aspectos y en algunos de ellos se requieren finos ajustes entre el derecho de propiedad individual y la facultad gubernamental de tomar propiedad para el uso público. Considerando la índole de los planteamientos del presente caso, estimamos que la opinión unánime del Tribunal Supremo federal en *Berman* v. *Parker*, supra, escrita por el Juez Asociado Sr. Douglas, y que versa sobre leyes de renovación

---

(⁷) Las funciones de las autoridades se traspasaron en 1957 a la Administración y a la Corporación de Renovación Urbana y Vivienda (17 L.P.R.A. secs. 21–24).

(⁸) Citas de la jurisprudencia y comentarios competentes sobre ella se encuentran en Lavine, *Extent of Judicial Inquiry into Power of Eminent Domain*, 28 So. Cal. L. Rev. 369 (1955); *Public Use as a Limitation on Eminent Domain in Urban Renewal*, Monografía en 68 Harv. L. Rev. 1422 (1955); *Validity, Construction and Effect of Statutes Providing for Urban Redevelopment by Private Enterprise*, Monografía en 44 A.L.R.2d 1414 (1955); Guandolo, *Housing Codes in Urban Renewal*, 25 Geo. Wash. L. Rev. 1 (1956); Marquis, *Constitutional and Statutory Authority to Condemn*, 43 Iowa L. Rev. 170 (1958); Johnstone, *The Federal Urban Renewal Programs*, 25 U. of Chi. L. Rev. 301 (1958); *Urban Renewal: Problems of Eliminating and Preventing Urban Deterioration*, Monografía en 72 Harv. L. Rev. 504 (1959).

urbána del Distrito de Columbia prácticamente idénticas a las nuestras, expresa claramente no sólo los principios generales aplicables sino también las contestaciones a los reparos específicos de la recurrente. Sería, por consiguiente, completamente inútil, y en cierto modo sintomático de la debilidad de querer ser original a toda costa, elaborar una opinión para decir prácticamente lo mismo que con tanta lucidez, elegancia y autoridad ha dicho el Juez Douglas. Por ese motivo copiamos varios párrafos de esa opinión y adoptamos para nuestra jurisdicción y nuestras disposiciones constitucionales aplicables, los principios y normas que ellos contienen. Al así proceder, hacemos reserva, naturalmente, de nuestra facultad de darle contenido específico en casos futuros a las generalizaciones incluídas en estos párrafos, de acuerdo con los mandatos legislativos y las actuaciones administrativas pertinentes y con las particulares circunstancias de esos casos y de nuestro medio.

"El poder del Congreso sobre el Distrito de Columbia incluye todos los poderes legislativos que puede ejercer un estado sobre sus asuntos. Estamos considerando, en otras palabras, lo que tradicionalmente se ha conocido con el nombre de poder de reglamentación (*police power*). Es infructífera cualquier tentativa de definir su alcance o trazar sus límites exteriores, pues cada caso debe juzgarse de acuerdo con sus propios hechos. La definición es esencialmente el producto de determinaciones legislativas dirigidas hacia los propósitos del gobierno, y éstos ni en abstracto ni históricamente pueden ser objeto de una definición completa. Sujeto a limitaciones constitucionales específicas, cuando la legislatura ha hablado, el interés público ha sido declarado en términos prácticamente finales (*well-nigh conclusive*). En tales casos, la legislatura y no la judicatura es el guardián de las necesidades públicas a ser servidas por la legislación social, ya sea el Congreso legislando para el Distrito de Columbia o los estados legislando sobre asuntos locales. Este principio no admite excepción meramente porque resulte afectado el poder de expropiación forzosa. El papel de la judicatura al determinar si ese poder se está usando para un propósito público es uno extremadamente modesto.

"La seguridad pública, la salud pública, la moral, la paz y la tranquilidad, la ley y el orden—son estos algunos de los ejemplos más conspicuos de la aplicación tradicional del poder de reglamentación a los asuntos locales. Sin embargo, sólo ilustran el ámbito del poder y no lo circunscriben. Condiciones de vivienda miserables y desdorosas pueden hacer algo más que propagar la enfermedad y el crimen y la inmoralidad. Pueden también sofocar el espíritu al rebajar a las personas que así viven al status de ganado. Pueden en verdad convertir la vida en una carga insufrible. Pueden también ser una fea llaga, un baldón para la comunidad que le robe su encanto, que le convierta en un sitio del cual los hombres se aparten. La miseria de las viviendas puede ensuciar a una comunidad lo mismo que una cloaca abierta puede enturbiar un río.

"No estamos aquí para determinar si un proyecto de viviendas específico es o no deseable. El concepto del bienestar público es amplio e inclusivo. Los valores que representa son tanto espirituales como físicos, estéticos como económicos. Está dentro del poder de la legislatura determinar que la comunidad debe ser tanto bella como saludable, espaciosa como limpia, bien balanceada como cuidadosamente vigilada. En el presente caso, el Congreso y sus organismos autorizados han hecho determinaciones que toman en cuenta una gran variedad de valores. No nos incumbe evaluarlos de nuevo. Si aquéllos que gobiernan el Distrito de Columbia deciden que la capital de la nación debe ser tanto bella como saludable, no hay nada en la Enmienda Quinta que lo impida.

"Una vez que el objetivo está dentro de la autoridad del Congreso, es claro el derecho de llevarlo a cabo por medio del ejercicio del poder de expropiación forzosa. El poder de expropiación forzosa es meramente un medio para obtener un fin. Una vez que el objetivo está dentro de la autoridad del Congreso, corresponde también al Congreso escoger los medios para lograrlo. En este caso uno de los medios que se ha seleccionado es el uso de la empresa privada para la reurbanización del área. Los apelantes sostienen que este acto convierte al proyecto en una expropiación de un comerciante para beneficio de otro comerciante. Pero los medios de llevar a cabo el proyecto corresponde determinarlos al Congreso y solamente al Congreso, una vez se haya establecido el propósito público. El fin público puede obtenerse tan bien o mejor por medio de un organismo de la empresa

privada que por medio de un departamento del gobierno—o así puede decidirlo el Congreso. No podemos decir que la propiedad pública es el único medio de promover los propósitos públicos de los proyectos de reurbanización de la comunidad. Lo que ya hemos indicado contesta también cualquier alegación sobre el hecho de que a ciertos dueños de propiedades en el área se les pueda permitir que readquieran sus propiedades para desarrollarlas en armonía con el plan total. Ese también es un medio legítimo que el Congreso y sus organismos pueden adoptar, si así lo consideran conveniente.

"        .        .        .        .        .        .        .

"Como ya hemos señalado, los programas de renovación de la comunidad no tienen, por mandato de la Constitución, que hacerse a remiendos—solar por solar, edificio por edificio.

"No compete a las cortes fiscalizar la selección de las colindancias ni revisar el tamaño del área de un proyecto específico. Una vez se ha decidido la cuestión del propósito público, la cantidad y clase de los terrenos que van a expropiarse para el proyecto y la necesidad de un predio particular para completar el plan integrado quedan dentro de la discreción de la rama legislativa.

"La Corte de Distrito tuvo graves dudas en cuanto al derecho de la Agencia de adquirir un título sobre toda la tierra en lugar de los edificios deficientes localizados en ella. No compartimos esas dudas. Si al realizar el proyecto de reurbanización la Agencia considera necesario adquirir un título completo sobre la propiedad inmueble afectada, así puede hacerlo. No corresponde a las cortes resolver si es necesario para una terminación feliz del proyecto que se expropien únicamente edificios inseguros, poco saludables o antiestéticos, o que se incluya el título sobre la tierra, como tampoco es función de las cortes sortear y escoger de entre las varias parcelas seleccionadas para expropiación.

"Los derechos de estos propietarios quedan protegidos cuando reciben la justa compensación que la Enmienda Quinta exige como precio de la expropiación." (348 U. S. 31–34, 35–36. Se han eliminado las citas.)

La constitucionalidad de los programas de renovación y reurbanización urbanas ha sido sostenida por la inmensa mayoría de los tribunales supremos de los estados frente a ata-

ques similares a los que estamos considerando.(⁹)   En anteriores sentencias hemos aceptado en nuestra comunidad la amplia discreción legislativa en cuanto a la determinación del "uso público", sujeta a una modesta intervención judicial;(¹⁰) la expropiación de terrenos para eliminar arrabales;(¹¹) y la distribución, cesión o arrendamiento de los terrenos expropiados a personas privadas para el logro de un fin o beneficio público.(¹²)   Resolvemos, considerando todo lo anterior, que las leyes de renovación y reurbanización urbanas de Puerto Rico tienen plena validez constitucional, tanto de su faz como en su aplicación a los hechos específicos de este caso.

En su segundo planteamiento el apelante impugna la valoración de los bienes fijada por el tribunal de instancia.   Sostiene que "en vista de las circunstancias especiales del presente caso" el tribunal cometió error al utilizar el método de capitalización de las rentas y al apreciar la prueba.   Es indispensable, por lo tanto, que examinemos la prueba que tuvo ante sí el juez sentenciador.

Junto con la demanda se consignó en el tribunal la suma de $4,640 como el estimado de la justa compensación por los terrenos del apelante, que se dividen en cuatro parcelas.   De esta cantidad $3,000 eran para la parcela núm. 1, $750 para la núm. 2, $405 para la núm. 3 y $485 para la núm. 4.   Se acompañó, además, a la demanda un plano del área en el cual consta la ubicación y el tamaño de las parcelas y sus colindancias.   La prueba sobre las condiciones de los terrenos se refiere a 29 de abril de 1955, fecha en la cual el Estado se incautó de los bienes (*taking*).

---

(⁹) Johnstone, *op. cit.* supra, pág. 312; Monografía en 44 A.L.R.2d 1414.

(¹⁰) *McCormick* v. *Marrero, Juez*, 64 D.P.R. 260, 267 (1944); *ELA* v. *Fajardo Sugar Co.*, 79 D.P.R. 321, 330, 334 (1956).

(¹¹) *Municipio* v. *Junta de Planificación*, 68 D.P.R. 646, 649 (1948); *Autoridad sobre Hogares* v. *Sagastivelza*, 72 D.P.R. 276, 284 (1951).

(¹²) *ELA* v. *Fajardo Sugar Co.*, supra, págs. 335–336; *Pueblo* v. *Saldaña*, 69 D.P.R. 711, 716–721 (1949).   Ese es también el criterio de la Corte de Circuito de Apelaciones. *People of Puerto Rico* v. *Eastern Sugar Associates*, 156 F.2d 316, 323–324 (CCA 1, 1946) *cert. denegado*, 329 U. S. 772 (1946).

La parte demandada ofreció el testimonio de un testigo, esposo de una de las demandadas. Este declaró en síntesis que la propiedad está ubicada cerca de varias carreteras importantes, que su mejor uso es el de urbanización, que solares similares valían a $8 metro cuadrado y que esto lo sabía porque algunos "amigos" se lo habían informado; que las parcelas tenían facilidades de luz, agua y servicios sanitarios, y el alcantarillado llegaba muy cerca; que los terrenos son llanos y que estaban alquilados a terceras personas; que todas las parcelas rentaban $60 mensuales y se recibían de $51 a $60 mensuales de dicha renta; que en las parcelas había de 39 a 40 casas y que sabía que para urbanizar había que adquirir esas casas. La parte demandada no ofreció ninguna otra prueba.

Por el demandante declaró el Sr. J. M. Canals, ingeniero civil y tasador de larga experiencia. Su capacidad fue aceptada por la parte demandada. El testigo declaró que había utilizado dos procedimientos para valorar la parcela núm. 1 (3,452 metros cuadrados). Mediante el primero valoró el terreno y las estructuras en $16,000 a base del valor en el mercado y el mejor uso del terreno.([13]) A esa cantidad le restó $12,640—el valor de las estructuras—computado sobre la base de costo de reconstrucción menos depreciación por observación, ya que se desconocía el costo original y la fecha de edificación. Este método produjo un resultado de $3,360 como valor del terreno. Le aplicó también el método de capitalización de las rentas y a base de una renta total de $41 mensuales, establecida esta suma por medio de una investigación personal, y capitalizada al 7½%, obtuvo un valor de $3,280. En las parcelas 2, 3 y 4 utilizó únicamente el primer procedimiento y obtuvo valores de $750, $405, y $485 para los terrenos, luego de descontar el valor de las estructuras.

---

([13]) Le asignó un valor de $5 el metro cuadrado a la parcela a base de ventas de solares a $6 y $7 pero que daban a calles afirmadas. Esta parcela no da a una calle afirmada, excepto en una extensión de 10 metros. El resto colinda con un callejón o vereda. Utilizó valores de $4.50 y $6 para dos de las otras parcelas debido a diferencias en la ubicación.

Declaró, además, el Sr. Canals que había hecho un estudio en el Registro de la Propiedad y visitas a compradores y vendedores y había determinado que no había habido ventas similares en esa zona; que al tiempo de la tasación y de la incautación por el estado no existían las urbanizaciones que más tarde se construyeron cerca de la zona; que el mejor uso de las parcelas sería destruir las estructuras y hacer una zona residencial; que había hecho la tasación en 1953 y que para el 1955 el mercado de Ponce fluctuó en un aumento de 10 a 15% sobre el 1953 en cuanto a la propiedad total y de 5 a 10% en cuanto a la tierra.

El juez sentenciador, luego de describir las parcelas y las estructuras [14] que existían sobre ellas y de reseñar los hechos que ya hemos mencionado sobre la ubicación, topografía y servicios, concluyó que "el uso más adaptable sería dedicarla a una urbanización moderna." Consideró, no obstante, que "su desarrollo sería tan costoso que resultaría prohibitivo económicamente" porque habría que adquirir las 49 edificaciones, algunas de ellas luego de procedimientos judiciales largos y costosos, destruirlas y limpiar el terreno y luego proceder a la urbanización cumpliendo con los reglamentos vigentes. Las parcelas, cuya extensión total es de 4,500 metros cuadrados, producirían un pequeño número de solares que ubicarían en una zona de arrabal. Concluyó que "su indeseabilidad resultaría evidente", que "el negocio terminaría en un fracaso económico absoluto", y que, por consiguiente, había que descartar el mejor uso como método de valoración. Utilizó, entonces, el método de capitalización de las rentas y a base de un ingreso mensual de $55, capitalizado al 9%, fijó una valoración de $7,333.33.

El apelante opone "dos objeciones básicas" a esa conclusión. Nos dice primero que los Exhibits A-1 y A-2 demues-

---

[14] "Casas en malas condiciones, de bajo precio, inseguras y antihigiénicas."

tran([15]) que al momento de la incautación existían sólo cuatro edificaciones sobre las parcelas y no cuarenta y nueve como concluyó el tribunal y que, por lo tanto, las parcelas "no estaban sujetas a ese factor desfavorable". Olvida que su propio testigo declaró que "para el año 1955" había enclavadas en la propiedad casitas de alquiler, que producían entre $51 y $60 mensuales, que eran 40 casas y que sabía que para construir allí una urbanización tenía que adquirir las 40 casas.([16]) La prueba del demandante permitió al tribunal aumentar ese número a 49.

En segundo término, la recurrente sostiene que en este caso es claramente objetable el método de capitalización de las rentas. Dice que ese método se usa cuando la propiedad está destinada a su mejor uso y que no puede concluirse que "el mantenimiento de una zona de arrabal mediante arrendamientos" constituya tal mejor uso. Por el contrario, éste sería el de hacer en las parcelas una urbanización moderna y en tal caso la valoración debe ser de $5 por metro cuadrado.

Hay un obstáculo infranqueable para la recurrente. Ella no pudo presentar prueba alguna para sostener su posición ni puso al juez en condiciones de valorar los terrenos tomando por base la probable construcción de una urbanización.([17]) Su método descansa, pues, "en bases inciertas y especulativas".([18]) *Pueblo* v. *Huyke*, 70 D.P.R. 754, 756 (1950).

---

([15]) El abogado del demandante aclaró para el récord que aunque de las alegaciones de la demanda surgía que había cuatro casas "lo cierto es que habían más."

([16]) T. E. págs. 23, 27, 28–30. El testigo examinó una lista de cobros (T. E. pág. 26) para fijar el número de casas en 40. Es, además, muy cuestionable, aunque no tenemos que decidirlo, si al fijar la valoración no podía el tribunal tomar en cuenta que el Estado le había limpiado el terreno al apelante con anterioridad a la incautación.

([17]) En un procedimiento de expropiación forzosa en que la cuestión en controversia sea la cantidad a pagarse al dueño, éste ocupa la posición del demandante y debe probar su derecho a recobrar una suma mayor que la consignada. *Pueblo* v. *García*, 66 D.P.R. 504, 508 (1946); *Pueblo* v. *632 Metros*, 74 D.P.R. 961, 976 (1953).

([18]) "Al determinar el valor en el mercado de una propiedad inmueble para propósitos de expropiación, no debe considerarse únicamente el valor de la propiedad para el uso que el dueño le ha dado. La posibilidad de su

Dijimos en esa sentencia:

"A los efectos de la justa valoración, precisa considerar que no son solares sino una parcela de terreno lo que se ha expropiado; no debe tomarse por base lo que un especulador, arriesgándose, podría obtener en el futuro, sino el precio que un comprador en una venta no forzada estaría dispuesto a pagar y aquél en que un vendedor, en las mismas circunstancias, estaría dispuesto a vender, consideradas las condiciones en que se halle el terreno en la fecha de la expropiación, y el uso más productivo a que el dueño pudiere dedicarlo dentro de un futuro razonable cercano."

Tampoco se expropiaron solares en el presente caso, sino una parcela de 4,500 metros cuadrados, que contenía 49 edificaciones, metida en una zona de arrabal y que al momento de la incautación no tenía cerca las urbanizaciones que luego se construyeron.

Además de lo anterior, nos parecen eminentemente razonables los motivos que tuvo el juez sentenciador para descartar la posibilidad de que los terrenos pudieran usarse para una urbanización al momento de incautarse de ellos el Estado. Estamos conscientes de las debilidades del método de capita-

---

uso para todos los propósitos, presentes y futuros, para los cuales se adapte y para los cuales pueda razonablemente adaptarse, debe considerarse. Su valor para el uso que puedan asignarle, si a ellos perteneciera, hombres prudentes y conocedores y que dispongan de medios, debe ser el índice final. Por otro lado, no deben tomarse en consideración usos posibles que sean remotos o especulativos o que requieran la concurrencia de tantos sucesos y condiciones extrínsecas como para no tener un efecto perceptible sobre el valor presente en el mercado. Puede presentarse evidencia que pruebe los usos a que naturalmente puede adaptarse la propiedad en su condición presente. Los futuros planes o esperanzas del dueño son completamente irrelevantes. Esos asuntos se estiman muy remotos o especulativos para ser considerados." 4 Nichols, *The Law of Eminent Domain*, sec. 12.314, págs. 89–97. Véase, además, en 5 Nichols, *op. cit.* sec. 18.11(2) la discusión del tema *"Evidence of Potential Use"*. Compárese, finalmente, la prueba sobre "mejor uso" que se ofreció y aprobamos en *Pueblo* v. *Ocean Park Development Corp.*, 73 D.P.R. 360 (1952) y *ELA* v. *Ocean Park Development Corp.*, 79 D.P.R. 158 (1956) con la que tuvo ante sí el Tribunal Superior en el presente caso.

lización de las rentas, ([19]) pero completamente convencidos de que en esta expropiación era el único que la prueba permitía utilizar.

*Se confirmará la sentencia apelada.*

Los Jueces Asociados Sres. Saldaña y Hernández Matos no intervinieron.

---

([19]) Jahr, *Law of Eminent Domain* (1957) págs. 225–232; 5 Nichols, *op. cit.* secs. 19.2–19.23, págs. 214–221.