EL ESTADO LIBRE ASOCIADO DE PUERTO RICO, ETC., demandante y apelado, *v.* THE OCEAN PARK DEVELOPMENT CORPORATION ET AL., demandados y apelantes.

Número 10452.

*Sometido:* 3 de octubre de 1955. *Resuelto:* 30 de abril de 1956.

*Brown, Newsom & Córdova,* abogados de los apelantes; *Hon. Secretario de Justicia José Trías Monge* y *Clemente Pérez Martínez* y *Jaime J. Saldaña, Procuradores Auxiliares,* abogados del apelado.

EL JUEZ PRESIDENTE SEÑOR SNYDER emitió la opinión del Tribunal.

El 30 de noviembre de 1948 El Pueblo de Puerto Rico instó demanda de expropiación forzosa en el anterior Tribunal de Expropiaciones con el fin de adquirir alrededor de 21 cuerdas de terreno para la construcción y establecimiento de un parque público. Este terreno se componía de 3 parcelas colindantes entre sí. Una de ellas consistía de 5.7034 cuerdas y era propiedad de la Ocean Park Development Corporation, en adelante denominada Ocean Park. Las otras dos parcelas— de 13.9638 y de 1.50 cuerdas, respectivamente—pertenecían en común proindiviso a Felipe Segarra y Eduardo G. Gon-

zález. La única cuestión aquí en controversia es el monto de la justa compensación a pagarse por las tres parcelas. Celebrado un juicio en los méritos, el tribunal sentenciador dictó sentencia concediendo a Ocean Park la suma de $61,645.90 por su parcela, y a Segarra y González la suma de $151,947.15 por sus dos parcelas.

Los demandados apelaron para ante este Tribunal. Sostuvimos la decisión del tribunal sentenciador admitiendo en evidencia ciertas certificaciones registrales en relación con ventas de terrenos similares. Tampoco encontramos error que diera lugar a la revocación en la actuación del tribunal sentenciador al no darle valor probatorio alguno a la venta hecha por Segarra y González a Frank Ramírez de Arellano de una parcela de terreno que colindaba con los terrenos expropiados. Sin embargo, resolvimos que el tribunal sentenciador cometió un error matemático al calcular el precio promedio por metro cuadrado que había sido pagado en las ventas de solares similares *urbanizados*. (Ambas partes convinieron en el juicio que el mejor uso a que las parcelas expropiadas se podían dedicar era su urbanización para la venta de solares.) Por consiguiente devolvimos el caso al tribunal sentenciador *únicamente* para que determinara la compensación a concederse una vez corregido el referido error matemático. *Pueblo* v. *Ocean Park Development*, 73 D.P.R. 360.

Los demandados apelaron de nuestra sentencia para ante la Corte de Apelaciones para el Primer Circuito. En vista de su conclusión de que nuestra sentencia no era una decisión final, la Corte de Apelaciones desestimó el recurso por falta de jurisdicción. *Ocean Park Development Corp.* v. *People of Puerto Rico*, 204 F.2d 371 (C.A. 1, 1953). Entonces se devolvió el caso al tribunal sentenciador a tenor con nuestra opinión en 73 D.P.R. 360. El tribunal a quo resolvió que, no empece el error matemático cometido en su primera opinión, las sumas concedidas a los demandados en la sentencia original eran correctas. De conformidad con esto dictó sen-

tencia a favor de los demandados por las mismas cantidades. El caso se encuentra ahora ante nos en apelación interpuesta por los demandados contra la nueva sentencia.

■ El primer señalamiento es que el tribunal sentenciador cometió error al negarse a dar valor probatorio alguno a la venta del 19 de enero de 1948 de 45,000 metros cuadrados de terrenos similares colindantes con la parcela expropiada hecha por Segarra y González a Ramírez al precio de $4.50 el metro cuadrado.

La venta hecha a Ramírez fué admitida en evidencia durante el juicio. Pero en su opinión el tribunal sentenciador concluyó que dicha venta "...carece de valor probatorio alguno para la determinación final del valor en el mercado de las propiedades expropiadas a los demandados." Convenimos—según resolvimos en nuestra opinión en 73 D.P.R. 360 —en que esta actuación del tribunal sentenciador técnicamente no infringió la regla establecida en *Viera* v. *Sucn. Goitía*, 60 D.P.R. 653, al efecto de que evidencia admitida durante el juicio no puede eliminarse después de terminado éste. Además, si la opinión del tribunal sentenciador hubiera guardado silencio sobre esta cuestión o hubiera dicho que el tribunal le había dado algún peso a la venta de Ramírez, quizás no tendríamos base alguna para intervenir con su decisión. Pero si la venta a Ramírez era admisible en evidencia y merecía, como cuestión de derecho que se le diera algún peso, el tribunal sentenciador cometió error, luego de admitirla en evidencia durante el juicio, al decir en su opinión que no le daba a dicha venta peso alguno. Además, quizás los demandados hubieran presentado prueba pericial adicional si el tribunal les hubiera informado durante el juicio que rechazaba—a todos los fines prácticos—la venta a Ramírez. Debemos por tanto determinar si el tribunal sentenciador actuó correctamente al concluir que la venta a Ramírez carecía de valor probatorio alguno.

■ Cuando, como ocurre aquí, el mejor uso potencial que se le puede dar a una parcela yerma que se ha expropiado es

su urbanización para la venta de solares, los tribunales admiten evidencia de ventas similares de solares *urbanizados* en la misma área general, deduciendo de ellas los costos de urbanización, la reducción del área que resulta de la lotificación, y una ganancia razonable para el iniciador del proyecto. *United States* v. *Iriarte*, 166 F.2d 800, 804 (C.A. 1, 1948); *Cementerio Buxeda v. People of Puerto Rico*, 196 F.2d 177, 181 (C.A. 1, 1952); *Pueblo* v. *Ocean Park Development*, supra, págs. 374–5.([1]) Además, son también admisibles en evidencia ventas de parcelas *yermas* similares propias para urbanizar. Como cuestión de hecho, siempre y cuando no existan otros factores que se alejen sustancialmente de su similitud, las ventas de terrenos *yermos* podrían, bajo circunstancias adecuadas, ser aun más persuasivas que las ventas de solares *urbanizados:* cuando existen ventas de terrenos yermos, no hay necesidad de que un perito opine sobre los costos de urbanización y el beneficio, que es a lo mejor, una conjetura de una persona informada. Véanse *United States* v. *Miller*, 317 U.S. 369, 375; *Baetjer* v. *United States*, 143 F.2d 391, 397 (C.A. 1, 1944); *United States* v. *Ham*, 187 F.2d 265, 270 (C.A. 8, 1951); *Autoridad sobre Hogares de P. R.* v. *Valldejuli*, 71 D.P.R. 640, 643. De esto surge que si el tribunal sentenciador cometió error al no darle valor probatorio alguno a la venta a Ramírez de una parcela *yerma* colindante, el error fué perjudicial a los demandados.

▆▆▆ Una venta reciente y voluntaria de terrenos similares en la misma vecindad de los terrenos expropiados, que sería de otro modo admisible en evidencia sobre la cuestión de valor en el mercado del terreno expropiado, no obstante no es admisible si los terrenos vendidos aumentaron en valor

---

([1]) En verdad, la primera opinión del tribunal sentenciador demuestra que basó sus conclusiones con respecto al valor en el mercado de la parcela expropiada en gran parte en el precio promedio por metro cuadrado de ventas similares de solares *urbanizados* en la misma área general, restando de él las partidas arriba apuntadas. Véase *Pueblo* v. *Ocean Park Development*, supra, págs. 375–6.

antes de la venta en virtud del compromiso previo del gobierno de adquirir el terreno expropiado para la construcción de un proyecto público. *United States* v. *Miller*, supra; *Shoemaker* v. *United States*, 147 U.S. 282; *Kerr* v. *South Park Commissioners*, 117 U.S. 379; Orgel, *Valuation under Eminent Domain*, 2da. ed., pág. 427 *et seq.* Véanse *United States* v. *Cors*, 337 U.S. 325, 332; *Pueblo* v. *Sucn. Junghanns*, 73 D.P.R. 648. El tribunal sentenciador admitió en evidencia la venta a Ramírez. Pero descansando en el caso de *Miller* y en otros más, no le dió a dicha venta ningún valor probatorio, principalmente por el fundamento de que antes de la venta la parcela de Ramírez aumentó en valor por el compromiso del gobierno de construir un parque público en la parcela expropiada.(²)

Suponemos, según resolvió el tribunal sentenciador, que El Pueblo de Puerto Rico hizo el compromiso de construir el parque en 1946. Véase *Pueblo* v. *Ocean Park Devlopment*, supra, págs. 368–70. Nuestra dificultad estriba en que no encontramos en los autos la clase de aumento en el valor de la parcela de Ramírez entre 1946 y la venta del 19 de enero de 1948 aquí envuelta, *en virtud del proyecto público*, que justifique el no darle valor probatorio alguno a la venta a Ramírez como una venta similar.

El tribunal sentenciador resolvió que debido al proyecto del parque surgió tal aumento en el valor. Resolvió, según aparece en nuestra opinión en 73 D.P.R. a la pág. 369–70, que "...tenemos que llegar a la ineludible conclusión de que *una de las consideraciones importantes* que indujo a Ramírez a pagar $4.50 por metro cuadrado fué el hecho de que el establecimiento del parque entre los terrenos adyacentes hacía éstos más atractivos para la construcción de casas dedicadas

---

(²) El caso de *Miller* y los demás casos exigían la exclusión de evidencia más bien que el no darle peso alguno. Esto refuerza lo que ya hemos indicado: el no darle a la venta a Ramírez peso alguno, bajo las circunstancias de este caso, fué tan perjudicial a los demandados como el excluir dicha venta de la evidencia.

a fines residenciales." (Bastardillas nuestras.) (³) No podemos aceptar esta conclusión ya que de los autos no surge base adecuada para la misma.

La declaración fragmentada del único testigo—Ramírez —sobre la cuestión del aumento en el valor, no puede ser debidamente apreciada a menos que se examine la misma a la luz de la otra evidencia. Fué prueba no controvertida que desde 1946 a 1948 los terrenos incluídos en el área aquí envuelta aumentaron sustancialmente en valor debido a factores enteramente ajenos al proyecto del parque. Los peritos de ambas partes convinieron en que el mejor uso posible para la parcela expropiada y para las adyacentes era la urbanización en solares residenciales y comerciales. Un perito declaró, sin contradicción alguna, que en 1945 y 1946 las restricciones de la guerra no permitían la construcción de nuevas urbanizaciones y los valores eran bajos debido a esto durante dicho período. Un perito del Gobierno declaró que la parcela expropiada estaba rodeada por tres urbanizaciones y radicada en el eje natural de la expansión de Santurce. Otro perito de los demandados declaró, sin que se le contradijese, que los terrenos expropiados y los adyacentes eran los únicos disponibles para propósitos de urbanización en la zona de Santurce en 1948, y que existía una gran demanda de solares en dicha área.

Contra el anterior historial, pasemos al único testimonio que aparece de los autos sobre la cuestión del aumento en el valor a virtud del proyecto del parque. Primeramente citamos el contrainterrogatorio sobre este punto de Frank Ramírez de Arellano héchole por el abogado del Gobierno:

---

(³) El tribunal sentenciador añadió que Ramírez "...utilizó [el parque] como reclamo en un anuncio publicado en 22 de mayo de 1948...". 73 D.P.R. a la pág. 370. Este anuncio en el periódico simplemente incluía la manifestación, entre varias otras, de que el Gobierno ya había separado 20 cuerdas para la construcción de un parque. No podemos convenir en que este hecho—por sí solo—demuestre la clase de aumento en el valor de la parcela de Ramírez en virtud del parque público que justificara se excluyera de la evidencia la venta a Ramírez.

"P. Sr. Ramírez, en el momento de usted adquirir los terrenos de los señores Segarra y González, ¿tenía usted conocimiento de la reserva que había previamente hecho la Junta de Planificación de Puerto Rico, referente a los terrenos expropiados para dedicarlos a uso público? R. El plano que ellos me entregaron a mí ya indicaba el parque.

"P. ¿Tenía usted algún informe relativo a este hecho de dedicar estos terrenos a uso público que no surgiera esa información de los planos? R. ¿Cómo?

"P. ¿Tenía información que no surgiera de los planos? R. Sé que estaban tratando de que no le expropiaran el terreno porque esperaban vendérmelo a mí. Trataron de que no le cogieran el terreno.

"P. ¿Ese conocimiento que usted tenía de la reserva de los terrenos expropiados fué obtenido con anterioridad a las negociaciones para la adquisición de los terrenos de Santa Teresita? R. Sí, señor. Cuando hice el negocio teníamos conocimiento de que esa parte no podíamos hacer ninguna transacción sobre ella.

"P. ¿Sabe usted si se celebraron vistas públicas por la Junta de Planificación para determinar la conveniencia de dedicar esos terrenos a uso público? R. No lo sé. No fuí a ninguna de ellas.

"P. ¿Tenía conocimiento, antes de hacer la transacción, de que el uso público para el cual habían sido reservados los terrenos expropiados lo era para dedicarlos a la construcción y erección de un parque público? R. Ya le dije que los planos indicaban el parque y cuando hicimos las calles . . .

"Hon. Juez: Está establecido eso. Se admite en la contestación. Además, alega que era para eso. Ellos admiten todos esos hechos.

"Lic. Córdova: Estamos dispuestos a estipularlo que lo sabía.

"Lic. Saldaña:

"P. Sr. Ramírez, teniendo usted conocimiento previo de que eso iba a ser para parque y conociendo los terrenos de Santa Teresita en relación a su uso como terrenos susceptibles de urbanización, ¿tomó usted en consideración como un factor en dicha negociación el hecho de que en los terrenos iba a construirse un parque público? R. *A mí me hubiera convenido que no se hubiera hecho el parque.*

"P. ¿Si usted tomó en consideración ese hecho? R. No estoy seguro expresamente en este caso. *Naturalmente que un parque ayuda a darle realce a la urbanización, pero es tan grande el terreno, que nos quitó mucho terreno.*

"Hon. Juez: La pregunta no va a lo que conviniera a usted.

"Lic. Saldaña: ¿Tomó en consideración ese factor?

"Hon. Juez: *Además el establecimiento de un parque de esa naturaleza ayudaba mucho. El beneficio que le daba a la vecindad contribuía a que valieran más las propiedades.* R. *Sí, señor. Naturalmente.*

"Hon. Juez: *La opinión suya es que el establecimiento de un parque público indudablemente le daba más valor a las propiedades adyacentes al parque.* R. *Sí, señor."* (Bastardillas nuestras.)

Posteriormente, Ramírez declaró sobre este mismo asunto en el examen redirecto del abogado de Segarra y González lo siguiente:

"P. ¿Tenía la seguridad de que los terrenos que han sido expropiados para parque habrían de ser expropiados para parque cuando ofreció $4.50 en la sección este y oeste? R. *Tenía la esperanza de que Planificación desistiera del parque.*

"P. ¿Se reservó, en alguna ocasión, el derecho de cancelar su obligación de no comprar a $4.50 metro si por alguna razón se desistía de la expropiación del terreno?

"Lic. Saldaña: Nos oponemos.

"Hon. Juez: Bueno, es una pregunta. Hubo prueba. El testigo declaró a preguntas de la parte demandante que indudablemente los terrenos adyacentes a la parcela expropiada adquirirían mayor valor por la construcción del parque público. Contestó a esa pregunta que sí, que adquirirían mayor valor. Me parece que la intención de la pregunta es para aclarar eso.

"Lic. Córdova: Para establecer el precio del mercado. Si ese fué un factor tan dominante que le hubiese hecho a él ofrecer menos o desistir.

"Hon. Juez: La Corte la permite. R. *Yo no me reservé el derecho de desistir.*

"Lic. Córdova: *¿Convino, en alguna forma, que pagaría menos de los $4.50 metro si no se expropiaba el terreno para parque?* R. *No, señor.*

"Lic. Saldaña: Esas preguntas son sumamente sugestivas.

"Hon. Juez: Están en el redirecto. La Corte la permite y le dará el peso que la misma merezca. Conteste. R. No, señor.

"Lic. Córdova: ¿Estaba obligado a adquirir a $4.50 hubiese o no hubiese parque? R. Estaba obligado.

"Lic. Saldaña: Surge de los mismos contratos.

"Hon. Juez: Precisamente. Se pagó $4.50 cuando tenía conocimiento de que se iba a hacer el parque, aprobado por Planificación.

"Lic. Córdova:

"P. ¿Sabe si los señores Segarra y González hicieron esfuerzos porque no se expropiaran esos terrenos? R. Tengo entendido que hicieron todos los esfuerzos.

"P. Si lo sabe.

"Hon. Juez: De propio conocimiento. R. Lo sé.

"Lic. Córdova: *¿Para los fines de su urbanización y de su negocio, hubiese usted preferido la expropiación de los terrenos para parque o que hubiesen estado disponibles para ser urbanizados?*

"      .   .   .   .   .   .   .   .   .   .   .   .

R. *Hubiera preferido que hubiesen estado disponibles.*

"Hon. Juez: ¿Para su negocio? R. Sí, señor. Porque hubiera hecho más casas.

"Lic. Saldaña: ¿No es cierto que la Junta de Planificación separa el 5% de los terrenos a urbanizarse para parque y que aunque no se hubiese hecho este Parque, siempre hubiese habido un parque? R. *Esta mañana traté de explicar que cuando dije lo que yo creía del parque, me referí al parque que hay en todas las urbanizaciones. En este caso cogieron mucho terreno para hacer canchas de pelota, etc. Pero un parque, en el sentido que yo pensé, fué un parque pequeño.*

"Solicitamos que se elimine la opinión personal del testigo. La necesidad o conveniencia del parque es una cuestión legislativa.

"Hon. Juez: Eso no afecta en nada la cuestión que se ha declarado. Adelante.

"Lic. Córdova:

"P. ¿No es cierto que hoy día no puede haber una urbanización sin parque? R. No puede haberla porque la ley exige que se dé el 5% para parque.

"P. ¿Sabe si en este caso se asignó el 5% para parque?
R. Hay dos cuerdas y pico para parque.
"Hon. Juez: ¿Aparece del Exhibit 'A'? R. Sí, señor."
(Bastardillas nuestras.)

No podemos convenir en que este testimonio demuestre suficiente aumento en el valor entre 1946 y el 19 de enero de 1948 *atribuíble al compromiso del gobierno al proyecto del parque* como para privar a la venta reciente y voluntaria de la parcela a Ramírez el 19 de enero de 1948 de todo valor probatorio sobre la cuestión del valor en el mercado de la parcela expropiada el 30 de noviembre de 1948 para el proyecto del parque. Debe recordarse que no todo proyecto del gobierno aumenta el valor de los terrenos contiguos. Por el contrario, algunos proyectos gubernamentales, tales como cementerios o parques de bombas, pueden bajo ciertas circunstancias disminuir el valor de los terrenos contiguos. Y de los autos no surge evidencia específica y detallada sobre qué aumento en el valor—y hasta qué punto—resultaría para la parcela de Ramírez, que consistía de un gran número de solares de precio comparativamente alto, en virtud de un parque *potencial* para el cual, hasta donde surge de los autos, no se han hecho planes concretos. Es cierto que el tribunal sentenciador, interrumpiendo el contrainterrogatorio, *hizo una manifestación categórica* al efecto de que este parque en particular aumentaría el valor de la parcela de Ramírez, a lo cual Ramírez aparentemente asintió. Pero la aquiescencia un poco confusa—aunque quizás comprensible—de Ramírez sobre este pronunciamiento que el propio tribunal hizo, debe leerse en el contexto del resto de la declaración de Ramírez sobre este asunto. El testigo, como hemos visto, indicó que le hubiera convenido que no se hubiera planeado un parque en este sitio; que esperaba que el proyecto del parque fuera abandonado; que no se reservó derecho alguno de cancelar su compra o de recibir una rebaja en el precio en caso de abandonarse el proyecto del parque; que con su conocimiento Segarra y González habían tratado de persuadir al Gobierno

que abandonara el proyecto del parque; (⁴) y que cuando declaró, en contestación a la propia manifestación del tribunal en cuanto a la conveniencia del parque, tuvo en mente el requisito normal de la Junta de Planificación reservando el 5% del terreno en una urbanización para fines de parque, y no un parque grande de recreo que presumiblemente traería a la urbanización mucha gente que no vive en ella.

En vista de la declaración de Ramírez arriba copiada leída en conjunto, en unión al testimonio pericial al efecto de que el aumento en el valor del terreno en esta área entre 1946 y 1948 era atribuíble a la demanda de solares residenciales y comerciales inmediatamente después que desaparecieron las restricciones de guerra, nos vemos obligados a diferir del tribunal sentenciador al efecto de que el proyecto del parque fué "una de las consideraciones importantes" que indujeron a Ramírez a pagar $4.50 por metro cuadrado por los 45,000 metros cuadrados de terrenos adyacentes.   De esto surge que el tribunal sentenciador cometió error al no darle *valor probatorio alguno* a la venta de Ramírez por el supuesto fundamento de que su valor fué aumentado por el proyecto del parque entre 1946 y el 19 de enero de 1948. (⁵)

▮▮▮▮   En nuestra primera opinión en este caso resolvimos que ciertos "otros factores"—en adición al alegado aumento en el valor de la parcela de Ramírez debido al proyecto del parque—justificaron la negativa del tribunal sentencia-

---

(⁴) Otra prueba en los autos demuestra que Segarra y González hicieron esto con la cooperación de Ramírez.   Véase *Segarra* v. *Junta de Planificación*, 71 D.P.R. 150.   Pero el testimonio de que el esfuerzo de convencer al Gobierno de que abandonara el proyecto del parque iba acompañado de una oferta de Ramírez de comprar la parcela expropiada a $4.50 el metro cuadrado, debe ser rechazado por el fundamento, entre otros, de que las ofertas de compra no son admisibles en evidencia con respecto a la cuestión del valor en el mercado.   *Pueblo* v. *Carmona*, 70 D.P.R. 312, 316.

(⁵) En una discusión con el tribunal sentenciador, el abogado de Segarra y González dijo: "Indudablemente recibieron algún beneficio en el mercado por el hecho de que existía la probabilidad de que iba a haber Parque.   *Lo correcto sería establecer que no obstante la no existencia de ese Parque se hubiese pagado ese mismo precio.   Para que Su Señoría le dé el valor que quiera darle.*"   (Bastardillas nuestras.)   Nada encontra-

dor a darle valor probatorio alguno a la venta a Ramírez. 73 D.P.R. a las págs. 372–74. Al volver a examinar esta cuestión, concluímos que el tribunal sentenciador y este Tribunal cometieron error al resolver que estos "otros cuatro factores" exigían que se rechazara la transacción de Ramírez como una venta reciente y voluntaria de terrenos similares.

Primeramente, el hecho de que Ramírez comprara esta parcela a plazos no hace que la venta a él sea inadmisible si en todo lo demás cumplió con los requisitos de una venta reciente y voluntaria de bienes similares. *United States* v. *Certain Parcels of Land, etc.,* 144 F.2d 626, 630 (C.A. 3, 1944) ; *Bartlett* v. *City of Medford,* 147 N.E. 739 (Mass., 1925) ; Orgel, supra, pág. 593. El aspecto de pagos a plazos de dicha venta se toma en consideración al apreciar la evidencia de la venta cuando el juzgador de los hechos determina *el grado de similitud* de la venta. En verdad, Ramírez en su declaración admitió que la compra a plazos fué una de las consideraciones que hicieron posible la venta. Y el abogado de Segarra y González admitió en el juicio que el valor en el mercado sería menos en una venta de contado que en una venta a plazos. (⁶) Pero el aspecto de pago a plazos de

mos en estas manifestaciones del abogado que afecte nuestra decisión en vista de que convenimos sustancialmente con la parte en bastardillas de las mismas.

También debe tenerse en cuenta que si, según afirma el Gobierno, estaba comprometido al proyecto del parque a principios de 1946, la parcela contigua—según su teoría—fué aumentada en valor en esa fecha. No obstante, los autos demuestran que González y Segarra compraron porciones del terreno expropiado *en fechas posteriores* a precios comparativamente modestos considerablemente más bajos que lo que el propio tribunal a quo declaró en su sentencia valía cuando fué expropiado en 1948. Esto ratifica nuestro criterio de que el aumento sustancial en el valor en el mercado para 1948 tanto del terreno expropiado como de la parcela de Ramírez era atribuíble casi en su totalidad a factores ajenos al proyecto del parque.

(⁶) El ejemplo que dió fué que bajo las circunstancias de este caso el tribunal podría hallar un valor en el mercado de $4.25 el metro cuadrado en la parcela de Ramírez en vez de $4.50 el metro cuadrado, debido a la disposición del precio aplazado. El tribunal sentenciador, desde luego, pudo resolver que éste y otros *factores* harían que la parcela expropiada valiese aun menos.

la venta de Ramírez sólo reducía en cierto modo el grado de su similitud al caso ante nos; no exigía que se excluyera dicha venta de la evidencia.

En segundo lugar, no vemos cómo la opción concedida a Ramírez para comprar terrenos adicionales al mismo precio afectara la admisibilidad o destruyera completamente el valor probatorio de la venta de los 45,000 metros cuadrados héchale a él. Los autos demuestran que Ramírez de hecho ejercitó esta opción y más tarde compró unos 113,547.21 metros cuadrados. Es innecesario determinar si esta segunda venta era también evidencia del valor en el mercado de los terrenos expropiados. Basta decir que no proporciona motivo alguno para excluir o para no darle valor probatorio alguno a la venta de 45,000 metros cuadrados el 19 de enero de 1948, que ahora estamos considerando.

En tercer lugar, la obligación de los vendedores de obtener la aprobación de los planos de urbanización y el hecho de que habían pagado la suma de $8,000 por ellos no exige tampoco que se rechace totalmente la venta a Ramírez. La suma de $8,000 debe rebajarse del precio de venta toda vez que los planos de urbanización—según admiten los demandados—son pagados generalmente por el urbanizador. Pero una vez rebajada dicha cantidad, el hecho de que la venta a Ramírez estuviera condicionada a la aprobación de los planos de urbanización no la hace inadmisible en vista del testimonio incontrovertido de que la parcela de Ramírez era propia para lotificación en solares residenciales.

En cuarto lugar, el saneamiento en caso de evicción simplemente reexpone las condiciones que gobiernan las ventas de bienes inmuebles bajo los arts. 1350, 1365 y 1367 del Código Civil, ed. de 1930, y por consiguiente no tenía efecto alguno en la admisibilidad en evidencia o en el valor probatorio de la venta a Ramírez.

No debe entenderse que resolvemos que la venta a Ramírez es decisiva con respecto al valor de la parcela ex-

propiada. Sólo resolvemos que el tribunal sentenciador cometió error al no darle valor probatorio alguno como venta similar, si bien no idéntica. El grado de similitud debe ser determinado por el tribunal sentenciador, luego de apreciar toda la evidencia. Es el deber del tribunal a quo darle a la venta a Ramírez algún peso—luego de rebajar el precio pagado por Ramírez debido a la naturaleza del precio aplazado de la venta y a la adquisición de los planos de urbanización— junto con toda la otra prueba pertinente en el caso. El que se dé a la venta a Ramírez peso decisivo—o sólo sustancial— es en análisis final una cuestión a ser resuelta por el tribunal sentenciador.

En nuestra primera opinión en este caso aprobamos la decisión del anterior Tribunal de Expropiaciones al efecto de que la venta a Ramírez no merecía que se le diera peso alguno. 73 D.P.R. 360. El Gobierno sostiene en esta segunda apelación que nuestra primera opinión es "la ley del caso" sobre este punto. El tribunal sentenciador tenía desde luego la obligación al devolvérsele el caso de seguir nuestra decisión a ese efecto. *Lluberas* v. *Mario Mercado e Hijos,* 77 D.P.R. 458, y casos allí citados; *Tartak* v. *Tribunal de Distrito,* 74 D.P.R. 862, 869 a 873. También, hablando en términos generales, cuando en una apelación anterior ante este Tribunal se ha resuelto una cuestión, bajo la doctrina de la ley del caso no volvemos a examinarla en una apelación posterior del mismo caso. *Esprívalo* v. *Cerezo,* 47 D.P.R. 423; *Olmedo* v. *Rivera,* 65 D.P.R. 49, 56; *West India Oil Co. (P.R.)* v. *Buscaglia, Tes.,* 68 D.P.R. 792, 794; *Lluberas* v. *Mario Mercado e Hijos,* supra. Pero esta última regla general no es un mandato inexorable. La misma "...expresa la práctica de los tribunales en general de negarse a reabrir lo que ya está resuelto, pero no es una limitación a su poder." *Messenger* v. *Anderson,* 225 U.S. 436, 444. En muchas jurisdicciones una decisión anterior no

opera como la ley del caso en una apelación posterior cuando
su aplicación produciría resultados "manifiestamente injus-
tos". *Law of the Case*, 5 Stan.L.Rev. 751, 755–6; Nota,
*Successive Appeals and the Law of the Case*, 62 Harv.L.Rev.
286, 287; *England* v. *Hospital of the Good Samaritan*, 97
P.2d 813 (Cal., 1939); *Standard Oil Co.* v. *Johnson*, 132 P.2d
910 (Cal., 1942); *Mangold* v. *Bacon*, 141 S.W. 650 (Mo.,
1911). Véase la *Anotación*, 118 A.L.R. 1286. No nos dete-
nemos a determinar si tal excepción a la regla de la ley del
caso debe adoptarse en esta jurisdicción. *Cf.* Nota, *Succes-
sive Appeals and the Law of the Case*, 62 Harv.L.Rev. 286;
*Law of the Case*, 5 Stan.L.Rev. 751, 764–7; *Dictograph Pro-
ducts Co., Inc.* v. *Sonotone Corp.*, 230 F.2d 131 (C.A. 2, 1956),
24 L.W. 2359.[7] Aquí, toda vez que los terrenos de los de-
mandados fueron expropiados con anterioridad a 1952, la ad-
misibilidad en evidencia de la venta a Ramírez puede quizás
envolver una cuestión federal bajo el caso de *Buxeda*, que fué
resuelto por la Corte de Apelaciones para el Primer Circuito
luego de nuestra primera opinión en el presente caso. Véase
la opinión concurrente del Juez Presidente Magruder, en la
cual concurrió el Juez Woodbury, en *Cementerio Buxeda* v.
*People of Puerto Rico*, supra 181. Bajo estas circunstancias
creemos que pondrá fin más rápidamente a este caso—que ya
ha sido apelado a la Corte de Apelaciones una vez y a este
Tribunal dos—el que corrijamos el error que cometimos en
nuestra primera apelación más bien que adherirnos a nuestro
criterio original equivocado bajo la doctrina de la ley del caso
que, después de todo, tiene como fin primordial la más pronta
terminación de los litigios. Por consiguiente no nos adheri-

---

(7) Compárese también el lenguaje del caso de *United States* v. *Iriarte*,
supra—que era la segunda apelación en el mismo—a la pág. 802: "La
apelación de los terratenientes contra la presente sentencia dictada a
tenor con esta conclusión no levanta cuestión alguna que ya no hayamos
considerado. Toda vez que no se ha ofrecido nueva evidencia ni se han
citado nuevos casos, bastará decir que no vemos motivo alguno para al-
terar o modificar los puntos de vista expuestos en nuestra opinión anterior."

remos bajo la ley del caso a nuestra decisión en 73 D.P.R. 360 con respecto a la venta a Ramírez. Por el contrario, resolvemos ahora, como ya hemos indicado, que al devolvérsele el caso el tribunal sentenciador debe darle a la venta a Ramírez algún peso.

Los demandados también señalan como errores: (*a*) la negativa del tribunal sentenciador a aumentar el importe de la sentencia una vez corregido el error matemático que se indicó en 73 D.P.R. 360; (*b*) la actuación del tribunal sentenciador al usar el promedio del precio promedio por metro cuadrado a que fueron vendidos varios solares similares urbanizados, en vez de usar el promedio del precio por metro cuadrado, dividiendo el precio total recibido por todos los solares por el total del área del terreno vendido. No encontramos en estas actuaciones del tribunal sentenciador error que dé lugar a la revocación, especialmente ya que el mismo tendrá, al devolvérsele el caso, que darle algún peso a la venta a Ramírez.

Los demandados también sostienen que la decisión del tribunal sentenciador al efecto de que la venta a Ramírez no tenía valor probatorio alguno, infringió varias disposiciones de la anterior Carta Orgánica y de las Constituciones Federal y del Estado Libre Asociado. En vista de nuestra decisión ordenándole al tribunal sentenciador que dé algún peso a la venta a Ramírez, no tenemos que considerar las cuestiones constitucionales levantadas por los demandados.

*La sentencia del Tribunal Superior será revocada y el caso devuelto para nuevas conclusiones de hechos y de derecho, y nueva sentencia consistente con esta opinión.*

Los Jueces Asociados Sres. Negrón Fernández y Saldaña no intervinieron.