Estado Libre Asociado de Puerto Rico, demandante y recurrido, *v.* Gerardo Fonalledas Córdova, demandado y recurrente.

Número: 12594   Resuelto: 8 de marzo de 1962

574

576

*Virgilio Brunet,* abogado del recurrente; *Hiram R. Cancio, Secretario de Justicia, Arturo Estrella, Secretario Auxiliar de Justicia, V. M. Sánchez Fernández, Jefe, División Casos de Tierras,* abogados del recurrido.

Sala integrada por el Juez Presidente Señor Negrón Fernández como Presidente de Sala y los Jueces Asociados Señores Blanco Lugo y Dávila.

EL JUEZ ASOCIADO SEÑOR BLANCO LUGO emitió la opinión del Tribunal.

A requerimiento de la Autoridad Municipal sobre Hogares de la Capital, el Gobernador del Estado Libre Asociado de Puerto Rico instruyó en 24 de diciembre de 1953 un procedi-

miento para expropiar una parcela de 43.4097 cuerdas, propiedad del demandado Gerardo Fonalledas Córdova. En dicha parcela se construyó el caserío Nemesio R. Canales para familias de ingresos bajos. Se consignó como compensación justa y razonable la suma de $128,944.00. Varios meses después el demandado contestó y se limitó a impugnar la cuantía de la compensación depositada, y alegó afirmativamente que la misma ascendía a $275,000. Dos años más tarde enmendó la contestación para alegar que el valor justo y razonable del predio expropiado era la suma de $372,394.40 (aproximadamente $8,600 por cuerda), y que además se le habían causado daños al remanente de la finca principal que se calcularon en $32,284.00. Se solicitó, pues, que se fijara la suma de $404,678.40 como compensación total.

La parcela objeto de expropiación formaba parte de una finca de mayor cabida de 133.30 cuerdas. Su topografía era llana, pero debido a la baja elevación de los terrenos se requería relleno hasta una altura promedio de siete pies y medio, para evitar que el Río Puerto Nuevo los inundara en sus crecientes extraordinarias. Para la fecha de la expropiación no contaba con los servicios de agua. Estaba clasificada por la Junta de Planificación como I-1, o sea, que en la misma se permitía un desarrollo para fines de establecer industrias livianas, fines comerciales, o fines residenciales. No tenía acceso directo a vías públicas aunque se encontraba situada muy cerca de la Avenida Roosevelt, arteria de intenso tránsito que atraviesa el centro del área metropolitana.

La controversia se redujo prácticamente a la determinación del importe de la compensación justa y razonable. Después de un largo proceso dominado principalmente por la presentación de prueba pericial, la Sala de Expropiaciones fijó la compensación en la misma suma que se depositó por el poder expropiante al iniciar el procedimiento. Ni más ni menos. El demandado apeló.

I

*Valor en el Mercado de la Parcela Expropiada*

Los errores principales que se señalan por el dueño apelante se refieren a la admisión y el rechazo de prueba sobre transacciones que se ofrecieron a los fines de establecer el valor en el mercado del predio expropiado. Expondremos las normas generales que ha trazado este Tribunal sobre el particular. ■■■

La justa compensación a que tiene derecho el dueño de un predio expropiado es aquella cantidad que representa todo el valor de la propiedad al tiempo de la incautación, y en ausencia de una definición estatutaria sobre este concepto de valor hemos favorecido la norma de fijarlo mediante la determinación del valor en el mercado del bien expropiado—"valor en plaza" se le llama en Hispanoamérica, véase, Canasi, *El Justiprecio en la Expropiación Pública*, (1952), pág. 124—o sea, el precio que un comprador estaría dispuesto a pagar en una venta voluntaria y que un vendedor estaría dispuesto a aceptar, considerando para ello las condiciones en que se halle el bien a la fecha de la expropiación y el uso más productivo o beneficioso a que podría dedicarse dentro de un futuro razonablemente cercano. *Pueblo v. Colón*, 73 D.P.R. 579 (1952); *Pueblo v. Sucn. Rabell*, 72 D.P.R. 574 (1951); *Pueblo v. Huyke*, 70 D.P.R. 754, 756 (1950). La fijación de este valor requiere una hábil sincronización de varios factores, y en último análisis, un sano equilibrio entre el derecho de los propietarios y las exigencias de la comunidad. Esta labor se hace todavía más difícil en el área metropolitana, región en donde la tierra disponible es escasa, y que ha experimentado una explosión poblacional sin precedentes que requiere la ampliación de los servicios públicos para atender adecuadamente las necesidades de la ciudadanía. Su determinación excluye bases inciertas y puramente especulativas, *Estado Libre Asociado v. Sucn. Gautier*, 81 D.P.R. 580, 594 (1951); *Autoridad sobre Hogares v. Colón*, 73 D.P.R. 215 (1952); *Pueblo v.*

*Huyke*, supra. Las ventas de propiedades similares constituyen la prueba principal del valor en el mercado, *Pueblo v. Amadeo*, 82 D.P.R. 102, 122 (1961), pero esta similaridad no presupone igualdad sino solamente semejanza. De ahí que es pertinente considerar la similaridad en topografía, facilidades, servicios, acceso, ubicación, cabida y el mejor uso de lo expropiado y los bienes comparables, *Pueblo v. Amadeo*, supra, *Estado Libre v. Bravo*, 79 D.P.R. 779, 785 (1956); *Estado Libre v. Ocean Park Development Corp.*, 79 D.P.R. 158 (1956); *Pueblo v. Colón*, 73 D.P.R. 579 (1952); *Autoridad sobre Hogares v. Colón*, 73 D.P.R. 215 (1952); *Pueblo v. Sucn. Rabell*, supra; *Autoridad sobre Hogares v. Viera*, 72 D.P.R. 732 (1951); *Pueblo v. Sucn. Quiñones*, 71 D.P.R. 261 (1951); *Pueblo v. Carmona*, 70 D.P.R. 312 (1949). La prueba pericial también ayuda a formar criterio sobre valor en el mercado, pero el juzgador no está inexorablemente obligado a seguir las opiniones vertidas, *Estado Librê v. Bravo*, supra; *Pueblo v. McCormick, Alcaide & Co.*, 78 D.P.R. 940 (1956); *Pueblo v. Sociedad Agrícola Mario Mercado e Hijos*, 72 D.P.R. 792 (1951); aunque hemos expresado preferencia por las ventas similares sobre la opinión pericial, que no es más que "la conjetura de una persona informada", *Autoridad sobre Hogares v. Valldejuli*, 71 D.P.R. 640 (1950). Siempre es conveniente recordar que no existe una norma inflexible de valoración, especialmente en cuanto a tierras se refiere, *Pueblo v. García*, 66 D.P.R. 504 (1946).

Examinemos las distintas ventas ofrecidas en evidencia.

### A

Por escritura de fecha 29 de junio de 1954 la Central San José Incorporada vendió a los hermanos Francisco, Pedro y Jaime Fullana ocho parcelas de terrenos sitas en Río Piedras, Puerto Rico, con una cabida total de 26.089 cuerdas, por precio de $249,094.80, o sea, a razón de $9,500.00 por cuerda aproximadamente. Estas figuraban inscritas en el Registro de la Propiedad como fincas separadas e independientes, con excep-

ción de dos pequeñas parcelas de 26 y 50 céntimos. Una de las parcelas no colindaba físicamente con las restantes, de las cuales estaba separada por la antigua carretera estatal número uno. El tribunal determinó que "su localización, su vecindad, su mejor uso—comercial—y su topografía eran superiores a la expropiada, razones por las cuales el valor de estos terrenos era mucho más alto que el de aquélla (la expropiada)."

El apelante impugna la admisión de esta transacción por tratarse de la venta de un grupo de parcelas y, porque, a su juicio, existe una notable diferencia en la localización de la parcela expropiada y los bienes a que se refiere esta venta.

En términos generales, la venta de un grupo de parcelas debe excluirse de la consideración como ventas similares ya que existe la posibilidad de que un comprador, en su deseo de adquirir determinada parcela, se vea obligado a adquirir otras de inferiores condiciones, y, además, la distribución del precio entre las distintas parcelas podría resultar arbitraria. *Sanitary District* v. *Boening*, 107 N. E. 810 (Ill. 1915) ; *Lanquist* v. *City of Chicago*, 65 N. E. 681 (1902) ; Orgel, *Valuation Under Eminent Domain* (2a. ed. 1953), § 140 (pág. 594) ; Jahr, *Eminent Domain—Valuation and Procedure* (1957), §139, págs. 214–215. Sin embargo, este principio no es aplicable en el presente caso ya que de la escritura de traspaso aparece claramente que aunque las fincas figuran registralmente como fincas separadas e independientes, forman un solo fundo y fueron vendidas "como un solo lote y por un solo precio global y alzado", y que la distribución que se hizo del precio entre las distintas parcelas fue a los únicos fines de la fijación de los derechos de inscripción en el Registro de la Propiedad. La intención manifiesta de las partes fue realizar una venta por precio alzado de un número de fincas que, si bien para fines de inscripción figuraban como fincas independientes, en realidad constituían una unidad desde el punto de vista de su aprovechamiento económico.

En cuanto a la diferencia fundamental existente entre la localización de ambas parcelas, creemos que tampoco asiste la razón al apelante. No hay duda alguna de que el predio expropiado está localizado en el corazón mismo del área metropolitana, con posibilidades de accesibilidad a un número mayor de personas, pero la parcela objeto de esta venta está situada a un extremo de la ciudad de Río Piedras, con facilidades comerciales obvias, especialmente para el estacionamiento de vehículos, que se ha tornado tan esencial en las actividades diarias. Por otro lado, la parcela expropiada no tenía un acceso inmediato a las vías públicas de intenso tránsito que la rodean, mientras la parcela objeto de la venta que consideramos estaba situada en la confluencia de importantes vías de comunicación. No hay duda que después de realizado el desarrollo total de la zona adyacente a la Avenida Roosevelt, esta diferencia no hubiese existido, o, con toda probabilidad la comparación hubiese sido favorable a la finca del apelante. Sin embargo, entraríamos a un campo de especulación que nos está vedado, pues en la fijación de valores es necesario considerar la situación actual a la fecha de la incautación. No se cometió el error apuntado.

## B

Mediante escritura de fecha 7 de mayo de 1955—transacción efectuada aproximadamente dieciséis meses después de la incautación—los hermanos Jaime y Jerónimo Fonalledas vendieron a la Compañía de Fomento Industrial de Puerto Rico, instrumentalidad gubernamental a la cual se le ha concedido expresamente el poder de expropiar (23 L.P.R.A. sec. 278g), dos parcelas de terreno con cabida de 31.601 cuerdas y 48.061 cuerdas, segregadas ambas de fincas de mayor cabida propiedad de dichos vendedores, por precio de $214,886.80 y $326,814.80, respectivamente, o sea, a razón de $6,800 por cuerda. El tribunal de instancia expresó que "La ubicación de esta parcela, sus servicios públicos, su vecindad, la calidad de sus suelos, su configuración, su mejor uso—estaba clasifi-

·cada en I-2, que permitía la instalación de industrias pesadas, además de uso comercial e industrial—son superiores a los de la parcela expropiada y, por tanto, su valor mucho más alto que el de esta última. Además, en la fecha de la transacción, los valores en el mercado de la propiedad real en la zona metropolitana incrementaron alrededor de un 50% en comparación con los valores prevalecientes en diciembre 24 de 1953, fecha en que el Estado adquirió título de la parcela expropiada."

Una de las condiciones esenciales para determinar sobre la admisibilidad de una venta es que ésta sea libre y voluntaria, *Pueblo* v. *Colón*, 73 D.P.R. 579, 588 (1952); *Autoridad sobre Hogares* v. *Sagastivelza*, 72 D.P.R. 276 (1951); *Autoridad sobre Hogares* v. *Valldejuli*, 71 D.P.R. 640 (1950); *Pueblo* v. *Lamboglia*, 70 D.P.R. 810 (1950). Es por eso que no hemos admitido evidencia del precio pagado por el Estado en transacción o por sentencia en otros procedimientos de expropiación, *Pueblo* v. *Colón*, 73 D.P.R. 579, 588 (1952), ni prueba de una compra hecha por una persona que se vio obligada a hacerla por haberle sido expropiada otra propiedad suya en la cual tenía establecido un negocio, *Pueblo* v. *Sucn. Rabel*, 72 D.P.R. 574, 581 (1951). Pero cuando con más frecuencia nos tenemos que enfrentar a esta determinación es en relación con ventas hechas a una entidad que puede ejercitar el poder de expropiación forzosa. Nuestra regla local no excluye automáticamente estas transacciones, pero corresponde a la parte que la invoca a los fines de la valoración demostrar que se trata de una venta libre y voluntaria, aunque ayudada por la presunción de que no fue hecha bajo coacción. *Autoridad sobre Hogares* v. *Valldejuli*, 71 D.P.R. 640, 643 (1950). Véanse, además, *Pueblo* v. *Amadeo*, supra, pág. 117; *Pueblo* v. *Colón*, 73 D.P.R. 579, 588 (1952); *Autoridad sobre Hogares* v. *Sagastivelza*, 72 D.P.R. 276 (1951).

El apelante señala que esta transacción no era admisible por no tratarse de una venta voluntaria, sino de una "for-

zada". (¹)    Debemos examinar la evidencia presentada para determinar si el tribunal de instancia erró al admitirla y al considerarla a los fines de la fijación de la compensación final adjudicada.

Con el fin de instalar proyectos industriales, la Compañía de Fomento Industrial de Puerto Rico realizó estudios de la propiedad de los hermanos Fonalledas sita en Hato Rey, y sometió una consulta a la Junta de Planificación de Puerto Rico sobre la conveniencia de adquirir las parcelas a que se ha hecho referencia.    23 R. & R. P. R. secs. 23-2 y 23-4; *cf. Borinquen Home Corporation* v. *Junta de Planificación*, 69 D.P.R. 209 (1948).    La Junta dio su aprobación para las adquisiciones de los terrenos en 25 de enero de 1955.    Luego de haberse efectuado varias tasaciones, la Compañía se dirigió por escrito a los propietarios en 7 de marzo de 1955 indicándoles su decisión de adquirir las parcelas y haciéndoles una oferta por la suma de $173,805.50 y $264,355.50.    Los propietarios dieron traslado de esta comunicación a su abogado Jaime J. Saldaña con instrucciones para que hiciera todos los estudios necesarios y negociara con la Compañía, así como para que los representara ante los tribunales si ello fuera necesario.

El Lic. Saldaña sostuvo conversaciones con representantes de la Compañía de Fomento Industrial y ofreció a éstos desarrollar los terrenos interesados para los mismos fines a que se proponía destinarlos esta entidad, obviando así la necesidad de la expropiación.    La proposición fue rechazada porque la Compañía interesaba ampliar su urbanización industrial colindante llamada Hato Rey Industrial Development, situada

---

(¹) No se impugnan las conclusiones del tribunal a quo sobre la existencia de diferencias entre las parcelas objeto de esta venta y la expropiada en cuanto se refiere a situación, calidad de suelos, accesibilidad de servicios públicos y mejor uso.    Tampoco se cuestiona la diferencia en valor en el mercado que se señala como existente entre la fecha de la expropiación—24 de diciembre de 1953—y la de esta venta—7 de mayo de 1955.    Aceptado este último hecho, resultaría que el valor en el mercado en 24 de diciembre de 1953 de las parcelas objeto de esta compraventa sería de aproximadamente $4,500 por cuerda.

en terrenos previamente adquiridos del Dr. Leandro López de la Rosa.   Ante esta actitud, continuaron las conversaciones, gestionándose por el representante de los dueños un aumento de la oferta original.   Finalmente la Compañía ofreció pagar a razón de $6,800 por cuerda, lo cual representaba un aumento de $103,560.60 sobre lo que se ofreció inicialmente, "indicándome que ellos no estarían dispuestos a pagar un solo centavo adicional y que siempre ellos adquirirían los terrenos —que no estaban dispuestos a pagar más dinero por ellos". En el curso de las negociaciones los representantes de la Compañía ratificaron su decisión "absoluta y definitiva de adquirir estos terrenos ya fuera por venta directa o a través de procedimiento de expropiación forzosa."   Ante esa situación, y con vista del aumento logrado, el Lic. Saldaña recomendó a sus clientes la aceptación de la última oferta "porque eso evitaba la angustia y las erogaciones fuertes de un procedimiento judicial, que siempre . . . deja sinsabores entre las partes litigantes."

El tribunal resolvió que bajo los hechos resumidos anteriormente la venta era voluntaria, y para ello consideró que el precio finalmente acordado fue el resultado de negociaciones sostenidas por las partes que se prolongaron por un término de aproximadamente dos meses, y que, además, "los hermanos Fonalledas han sido expropiados en propiedades de ellos en varias ocasiones con anterioridad a esa venta, y en aquellas ocasiones en que no estuvieron conformes han acudido al Tribunal de Expropiaciones, se ha celebrado juicio y se ha dictado sentencia."

Apreciada detenidamente la prueba sobre las circunstancias que rodean esta transacción, no podemos convenir que la venta efectuada fuera libre y voluntaria.   Es preciso tener en mente que los señores Fonalledas no tenían las parcelas vendidas en el mercado para la venta; que no habían gestionado la segregación de las mismas ante la Junta de Planificación, sino que esta iniciativa previa a la adquisición fue realizada por la Compañía de Fomento Industrial;  que en

efecto, una vez fue obtenida esta aprobación inicial de la Junta, la propiedad afectada solamente tiene un comprador hábil y disponible, o sea, la agencia que la interesa para dedicarla a algún fin público; que las negociaciones efectuadas entre la compradora y los vendedores tuvieron lugar con posterioridad a la aprobación de la segregación por la Junta de Planificación; que el simple hecho de que se obtuviera un aumento del precio contenido en la oferta original no excluía la amenaza de expropiación; que en todo momento los representantes de la agencia compradora indicaron su decisión firme e inalterable de adquirir las parcelas bien mediante venta o recurriendo a la expropiación, si no se aceptaba la oferta final formulada al representante de los vendedores. Finalmente, el hecho de que en esta ocasión los vendedores prefirieron no someter la controversia a adjudicación judicial en un pleito de expropiación forzosa no debe militar en su contra, especialmente cuando de los autos surge una explicación razonable para esta actitud. Se cometió error al admitir esta venta en evidencia.

C

En 18 de junio de 1953—seis meses antes de la expropiación—el señor Jerónimo Fonalledas convino en vender una parcela de 9.3514 cuerdas a la Porto Rico Telephone Company, por precio total de $110,260.98. Como la venta presuponía una previa segregación, la lotificación se sometió a la Junta de Planificación, que exigió, antes de impartirle su aprobación, la construcción de ciertas facilidades. El costo de construcción de estas facilidades se estimó por los técnicos de la Junta en $70,219.25, y cubría obras de calles, incluyendo acera, encintado y badenes, sistemas de obras hidráulicas, de alcantarillado pluvial y de distribución eléctrica. Una vez afianzada la obligación de proveer estas facilidades, se autorizó la segregación y se procedió al otorgamiento de la correspondiente escritura. La corporación compradora contribuyó con la suma de $18,000 para la realización de tales obras. El

tribunal rechazó esta transacción por considerar que se trataba de una parcela "semi urbanizada", y que, por tanto, no era comparable. Anteriormente había desestimado el reparo levantado por el demandante al efecto de que se trataba de un comprador especial. *Cf. Pueblo* v. *Sucn. Rabell*, 72 D.P.R. 574, 581 (1951). Convenimos que al así hacerlo actuó correctamente, ya que una apreciación de toda la prueba sobre el particular simplemente revela que la parcela por su céntrica localización, tenía un atractivo adicional para la compañía telefónica así como para cualquier otro comprador.

En *Estado* v. *Ocean Park Development Corp.*, 79 D.P.R. 158, 162–163 (1956) indicamos que cuando el mejor uso potencial de unos terrenos es su urbanización para venta de solares, ventas de solares urbanizados en la misma área general son admisibles en evidencia. Todo cuanto es necesario hacer para determinar el valor de la tierra no desarrollada es deducir los costos de urbanización, la reducción del área que resulta de la lotificación y una ganancia razonable para el iniciador del proyecto. Véanse, *Autoridad sobre Hogares* v. *Sagastivelza*, 72 D.P.R. 276 (1951) y *Autoridad sobre Hogares* v. *Viera*, 72 D.P.R. 732 (1951).

En el caso de autos existe una diferencia en la cabida entre las dos parcelas. Sin embargo, su localización y clasificación a los fines de zonificación es la misma, y en realidad, nos impresiona como que, teniendo en mente las diferencias entre ambas y reajustando la valoración por tal motivo,[2] esta parcela era una similar a la expropiada, *Autoridad sobre Hogares* v. *Viera*, 72 D.P.R. 732 (1951); *Pueblo* v. *Sucn. Quiñones*,

---

[2] Si al precio de venta de $110,260.98 se le adiciona la suma de $18,000 contribuida por la compradora para la realización de las obras requeridas por la Junta de Planificación, resultaría que la adquisición se hizo por $128,260.98. A esta cantidad puede restársele el costo estimado de las obras requeridas, según determinado por dicho organismo, o sea, $70,219.25, y lograríamos el precio aproximado de la tierra sin desarrollar: $58,041.73. El precio sería de alrededor de $6,200 por cuerda. Claro está, reconocemos que parte del costo de las obras beneficiaba otras tierras colindantes del vendedor y que, por tanto, no podríamos atribuirlo totalmente a la parcela expropiada.

71 D.P.R. 261 (1950); *Pueblo v. Carmona*, 70 D.P.R. 312 (1949). Además, esta transacción es la única entre las consideradas que tuvo lugar *antes* de la expropiación, y refleja más adecuadamente las condiciones del mercado. Debió admitirse la oferta de prueba y alguna consideración merecía en el análisis final para la fijación de la compensación.

## II

### *Daños al Remanente*

Con motivo de la expropiación, la finca principal de 133.10 cuerdas propiedad del demandado quedó reducida en su cabida a aproximadamente 89.89 cuerdas y dividida en dos parcelas de terreno sin inmediación física: una, de forma rectangular, de 34.53 cuerdas, situada al Este de la finca expropiada; la otra, de configuración muy irregular, de 55.36 cuerdas, situada al Noroeste de la finca expropiada. No se reclaman daños con motivo de la desmembración de la parcela rectangular.

La parcela de 55.36 cuerdas se subdivide en dos porciones de 34.17 y 21.19 cuerdas, sitas, respectivamente, al Oeste y Norte de la finca expropiada. La prueba del propietario tendió a establecer que estas porciones han quedado prácticamente aisladas—"embotelladas" fue el vocablo utilizado para describir su situación después de la expropiación—, y que debido a su configuración irregular se limita su mejor uso y se afecta para un mejor desarrollo, más armónico con el resto del área. Se indicó además que la configuración indicada requería mayores gastos de urbanización. Considerando estos factores el perito presentado por el demandado utilizó el método "usual" y estimó que los daños por desmembración ascendían a $32,284.00, o sea, la diferencia en valor de esta parcela remanente de 55.36 cuerdas antes ($264,530.00) y después ($232,246.00) de la expropiación. A los fines de la determinación del valor de dicho remanente antes de la expropiación, se consideró el mismo como parte de la finca, "como

parte integrante de la finca". (A., p. 147.) Específicamente declaró que no utilizó el método de valorar toda la finca antes y después de la expropiación.

Otros hechos pertinentes para determinar la procedencia de los daños al remanente fueron obtenidos a través del contrainterrogatorio por el demandante y a preguntas del juez que presidía. Se dijo que con motivo de la construcción de las obras del caserío que ubica en la parcela expropiada, este remanente tiene tres accesos consistentes en tres calles que desembocan en sus colindancias Norte, Este y Oeste, aunque se sostuvo que estas calles del caserío no podrán estar "sincronizadas" con un futuro desarrollo industrial del remanente. Presionado sobre este aspecto, el perito admitió que cuando hizo su determinación de daños sólo consideró la existencia de los accesos consistentes en las calles de seis metros de ancho que proporcionan salidas al Norte y al Este, pero no consideró otro acceso de dieciocho metros de ancho construido posteriormente al Oeste (A., 177), y que de haberlo hecho "modificaría [el estimado de los daños] porque no hay duda de que un acceso, después que sea amplio, reduce los daños, indudablemente" (A., 157). Luego repitió que este tercer acceso "elimina considerablemente" los daños (A., 160). Admitió también que desconocía la existencia de un desarrollo preliminar para la utilización de parte de los terrenos del remanente dentro del cual estas calles del caserío se coordinan en las vías que servirían la urbanización industrial. Aludió a la reducción de las facilidades de alcantarillado, luz y agua, pero aceptó que con la construcción del caserío tales facilidades están más cercanas al remanente sin que ello le haya costado suma alguna al propietario, lo cual es "beneficioso" para éste (A., 180). ■

En un procedimiento de expropiación forzosa el dueño del terreno expropiado puede reclamar compensación por los daños que con motivo de la expropiación sufre el remanente de su propiedad, *Pueblo* v. *García*, 66 D.P.R. 504, 511

(1946),(³) pero le corresponde demostrar la existencia de tales daños con prueba afirmativa, *Pueblo* v. *Sociedad Agrícola Mario Mercado e Hijos*, 72 D.P.R. 792 (1951). Sostiene, sin embargo, el Estado que el demandado apelante no utilizó el medio consagrado por este Tribunal para determinar los daños, ya que "debió valorar en su totalidad las 133 cuerdas (cabida total de la finca original) y después el remanente". Procede, pues, reexaminar los distintos métodos de valoración para determinar los daños por desmembración así como nuestros casos anteriores sobre el particular. ▆

Los daños al remanente de una finca expropiada se miden generalmente por la depreciación en valor de dicho remanente como consecuencia de la incautación. Para que puedan concederse estos daños ordinariamente se requiere que las propiedades—la expropiada y el remanente—sean contiguas. Véase, *Unity or contiguity of properties essential to allowance of damages in eminent domain proceedings on account of remaining property*, 6 A.L.R.2d 1197 (1949). En estos casos de expropiación parcial los tribunales de Estados Unidos han empleado dos métodos(⁴) para determinar el importe de la compensación a concederse al expropiado, incluyendo la suma correspondiente a los daños por desmembración. La mayoría favorece la llamada regla "usual" (*usual rule*) que consiste en adjudicar como compensación total el importe del valor en el mercado de la parcela expropiada—irrespectivamente de su relación con la propiedad en conjunto—más los daños al remanente de la finca principal, que consiste en la depreciación

---

(³) En el citado caso de *Pueblo* v. *García*, supra, indicamos que este derecho del propietario surgía de la cláusula del artículo 2 de la Ley Orgánica de 1917 que, entre otras cosas, prescribía que "(1) a propiedad particular no será tomada ni *perjudicada* . . . a no ser mediante el pago de una justa compensación . . ." Al mismo resultado se llega aplicando la sección 9 del Artículo II de la Constitución del Estado Libre Asociado, concebida en términos casi idénticos.

(⁴) También se utiliza un tercer método, que es menos favorecido—con la posible excepción del estado de Luisiana—que consiste en incluir en una sola suma los daños al remanente en el valor en el mercado de la parcela expropiada.

del valor en el mercado del remanente antes y después de la expropiación.(⁵)    Otras jurisdicciones han adoptado el método denominado "antes y después" (*before and after method*), mediante el cual se concede como *compensación total* la diferencia en el valor en el mercado de la finca principal antes de la expropiación y el valor del remanente después de la expropiación. Supone, pues, un proceso de valoración indivisible, sin fraccionamiento de rubros compensatorios.    Las autoridades sobre la materia prefieren este último, arguyendo que es más exacto y que se evita "la dicotomía artificial" del método "usual", bajo el cual existe la posibilidad de que se conceda compensación doblemente, *State* v. *Carpenter*, 89 S.W.2d 194 (1936) ; *Dept. of Public Works* v. *Griffin*, 137 N.E. 523 (1922), ante la imposibilidad de considerar la parcela expropiada a los fines de la fijación de su valor en el mercado, desvinculada de su utilidad como parte de la finca principal.(⁶)    Orgel, *Valuation under Eminent Domain* (1953), vol. 1, págs. 232 a 302, especialmente las secciones 48 a 53, 57, 64 y 65;  Nichols *On Eminent Domain* (3a. ed. 1951), vol. 4, secs. 14.21 y 14.231 a 14.232 (1) ; Jahr, *Eminent Domain—Valuation and Procedure* (1957), secs. 96 a 104; Schmutz, *Condemnation Appraisal Handbook* (1949), págs. 126 a 129; McMichael, *Appraising Manual* (3a. ed. 1948), págs. 424 a 426;  Dennis, *Partial Takings—Severance Damages and Just Compensation,* 30 So. Cal. L. Rev. 319–334 (1961) ; Goldstein, *Economic Evidence in Right of Way Litigation,* 50 Geo. L. Rev. 205, 207–213 (1961) ;  *Burns, Damages and Benefits from Constitutional Damaging and Partial*

(⁵) El método "usual" ofrece ciertas ventajas inmediatas al expropiado desde el punto de vista contributivo, ya que a los fines de calcular el beneficio tributable sólo se considerará la suma que se le adjudique como valor en el mercado de la parcela expropiada, excluyendo los daños por desmembración.    La cantidad concedida en concepto de daños meramente reduce la base o costo del remanente.    Véanse, *Seaside Improvement Co.* v. *Commissioner*, 105 F.2d 990 (C. C. A. 2, 1939) ; *Estate of Appleby*, 41 B.T.A. 18 (1940).

(⁶) Debido a que en Puerto Rico no interviene jurado en los pleitos de expropiación forzosa, este riesgo es mínimo.

*Taking*, 1961, Institute on Eminent Domain, págs. 119–138; Nota, 42 Minn. L. Rev. 106, 110–119 (1957).

Localmente, la primera referencia a daños por desmembración aparece en *Pueblo v. García*, 66 D.P.R. 504 (1946). Se trataba de la expropiación de dos parcelas de 1200.04 metros cuadrados y 1.819 cuerdas, segregadas de una finca principal en la cual enclavaba una casa que el demandado destinaba a vivienda. En adición al valor en el mercado de las dos parcelas expropiadas se reclamaron daños por la depreciación sufrida por la casa debido a la privación de acceso directo a la carretera que se construyó en lo expropiado y a la gran cantidad de polvo de la carretera que invadía la casa y la hacía inhabitable. Expresamos, a la página 513, que el daño sufrido consistía en "la diferencia entre el valor que *la casa* tenía en el mercado antes de construirse el viaducto y después". Según podrá apreciarse, el tribunal insinuó que el método apropiado para determinar los daños por desmembración era el "usual", pues estimó que la compensación a concederse no sólo incluiría el valor en el mercado de lo expropiado, sino también los daños sufridos por una casa que formaba parte del *remanente*.

En *Pueblo v. Anadón*, 69 D.P.R. 822 (1949), a pesar de que claramente dijimos que los daños por desmembración "nada tienen que ver con el justo valor, en sí, de la parcela expropiada a que como compensación tienen derecho los apelantes" (pág. 826), nos apartamos de la norma insinuada en el caso de *Pueblo v. García*, supra, y anunciamos que "correspondía a los apelantes demostrar el justo valor que tenía la finca [se refiere a la finca principal completa] antes de segregársele las diez cuerdas [expropiadas] y el justo valor que tiene después de la segregación." Citamos con aprobación a los comentaristas Nichols y Lewis, *op. cit.*, y de la opinión emitida en *Baetjer v. United States*, 143 F.2d 391, 396 (C.C.A. 1, 1944) para sostener que "la prueba necesaria para demostrar los daños por depreciación" es la diferencia entre el justo valor en el mercado de toda la finca antes de la expropiación

y el justo valor del remanente. Sin embargo, si se leen detenidamente las autoridades citadas se observará inmediatamente que la diferencia en valor a que aluden es la medida para determinar la compensación total (que incluye, por supuesto, los daños por desmembración), pero no es la medida para aisladamente determinar el importe de dichos daños, que luego se sumará al valor en el mercado de la parcela expropiada. Si ello fuera así, es claro que se estaría incluyendo dos veces el importe de los daños en la compensación total final.

Dos años después, en *Pueblo* v. *Sucn. Rabell*, 72 D.P.R. 574, 579–580 (1951), desestimamos la impugnación que hizo el poder expropiante de la concesión al demandado de una partida de $512.50 por concepto de daños por desmembración, y que se calculó tomando en cuenta el valor del *remanente* antes y después de la segregación. Una vez más aceptamos la regla "usual" para determinar estos daños, a los cuales nos referimos como "una merma real y efectiva en el valor de esa parcela en el mercado." En igual forma—depreciación del *remanente*, no de la finca principal en conjunto—nos referimos en *Pueblo* v. *Soc. Agríc. Mario Mercado e Hijos*, 72 D.P.R. 793 (1951) a la determinación de los daños sufridos por el expropiado con relación a una parcela de la finca principal que quedó separada, a cinco pies bajo el nivel de la vía de comunicación a construirse en la parcela expropiada: "la medida de daños a la *parcela A* no podía circunscribirse al costo del acceso sino a la disminución de *su valor en el mercado* . . ." ▪

En *Estado Libre* v. *Bravo*, 79 D.P.R. 779, 784 (1956), dijimos por vía de dictum, que "la regla para determinar la medida de los daños por desmembración (*severance damages*) como consecuencia de la expropiación de parte de una finca, ha sido ya establecida por las decisiones de este Tribunal, como la diferencia entre el valor razonable en el mercado de toda la propiedad como unidad antes de la expropiación y el valor razonable en el mercado de la parte que queda después." No tenemos duda alguna de que esta afirmación respondió a la

expresión contenida en el caso de *Pueblo* v. *Anadón*, supra, que previamente comentamos.   Como hemos demostrado en la discusión de nuestras decisiones sobre el particular, este Tribunal parece haber adoptado la regla de mayoría, o sea, la regla "usual" y en ese sentido debe entenderse que lo que intentamos establecer en el caso de *Bravo* fue que la medida de los daños por depreciación es la diferencia en el valor en el mercado del *remanente* antes y después de la expropiación. Esta diferencia en valor, que se traduce en una cantidad específica de dinero, sumada al importe del valor en el mercado de la parcela expropiada, constituye la compensación total a que tiene derecho el propietario de un fundo expropiado.

Tenemos que concluir, por tanto, que el perito del demandado utilizó el método de valoración de los daños por desmembración que había sido judicialmente sancionado por nuestras escasas decisiones hasta entonces. (7)   Sin embargo, el tribunal de instancia no fundó su conclusión sobre la existencia de estos daños en que el demandado no los hubiera probado en la forma que señala el Secretario de Justicia, sino que analizó la evidencia y sostuvo que los factores apuntados por el demandado no justificaban su concesión.   No sólo se demostró que el remanente no quedó aislado con motivo de la expropiación, sino que una apreciación objetiva de los hechos según resumidos precedentemente demuestra que el apelante no ha sido perjudicado en forma alguna.   El único factor a considerar como posible fuente de daños—la forma irregular del remanente— se desvanece ante el resto de la prueba que estableció la posibilidad de un desarrollo armónico del mismo.   Además, es innegable que parte de la conformación irregular se debió a la división de la comunidad efectuada entre el demandado y sus hermanos.   De todas formas, la declaración del perito sobre el importe reclamado de $32,284.00 quedó seriamente en

---

(7) Es preciso aclarar que el testimonio del perito del demandado a que nos hemos venido refiriendo se ofreció en 10 de septiembre y 1 de octubre de 1956, cuando aun no se había emitido la opinión en el caso de *Estado Libre* v. *Bravo*, supra, que tiene fecha de 13 de diciembre de dicho año.

entredicho luego de las admisiones que hizo en el contrainte-rrogatorio y a preguntas del magistrado que presidía, a las cuales nos hemos referido anteriormente.

Siendo ello así, no alteraremos la conclusión de la Sala de Expropiaciones a este respecto. El error no fue cometido.

## III

La discusión que precede y la lectura de la transcripción de evidencia nos ha convencido de que el tribunal a quo no consideró todos los elementos de prueba que tenía disponibles para llegar a la determinación final del valor en el mercado de la parcela expropiada, y que igualmente dio demasiado énfasis a otros factores y circunstancias concurrentes. En cuanto se refiere a la apreciación de la prueba pericial estamos en las mismas condiciones que el juez sentenciador, ya que no se trata estrictamente hablando de dirimir un conflicto de prueba claramente definido, pues no existe discrepancia notable en cuanto a las características físicas de la propiedad o los factores a aplicarse para determinar la valoración. Se trata más bien de una diferencia en el énfasis que debe dársele a estos factores. En vista de la conclusión a que hemos llegado, se hace innecesario discutir los otros errores señalados por el apelante.

Ordinariamente devolveríamos el caso para que se hiciese por la Sala de Expropiaciones una nueva determinación de valor a la luz de las cuestiones resueltas en esta opinión. *Pueblo* v. *Amadeo*, supra. Sin embargo, considerando que este litigio se inició hace cerca de nueve años, que la transcripción de evidencia es sumamente extensa y la prueba documental es abundante y ha sido revisada detenidamente por este Tribunal en la consideración del recurso, y que en la vista oral las partes manifestaron que preferían que este Tribunal dictara la sentencia que procediera, así lo haremos.

*Se modificará la sentencia dictada por el Tribunal Superior, Sala de Expropiaciones, en 15 de marzo de 1957, en el sentido de fijar el valor en el mercado de la parcela expropiada*

*a la fecha de la expropiación a razón de $4,500 por cuerda. En adición, la parte demandante deberá satisfacer intereses al tipo legal desde la fecha de la incautación sobre la diferencia entre la valoración fijada en esta sentencia y el importe de la suma originalmente depositada, 32 L.P.R.A. sec. 2908. Así modificada, se confirmará.*